**Chryztof KNECHT, et al., Plaintiffs,**

v.

**Terry COLLINS, et al., Defendants.**

**No. C–1–94–12.**

United States District Court, S.D. Ohio, Western Division.

Sept. 22, 1995.

---

David A. Skidmore, Jr., Frost & Jacobs, Cincinnati, OH, William Breck Weigel, Vorys, Sater, Seymour & Pease, Cincinnati, OH, for plaintiffs.

Marianne Pressman, Asst. Atty. General, Cincinnati, OH, for defendants.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on cross-motions for summary judgment. The Plaintiffs filed a Partial Motion for Summary Judgment (doc. 46), to which the Defendants responded (doc. 50), and the Plaintiffs replied (doc. 54). The Defendants filed a Motion for Summary Judgment (doc. 48), to which the Plaintiffs responded (doc. 51), and the Defendants replied (doc. 53). This Court heard oral argument on these motions on September 11, 1995, at 4:00 P.M.

The Plaintiffs also moved to dismiss Count I for retaliatory transfer and to dismiss Defendants Allan Champman and Gregory Trout (doc. 45). We hereby GRANT this motion and DISMISS Count I and these Defendants WITHOUT PREJUDICE.

## BACKGROUND

Plaintiffs, John Perotti, Keith Ledger and Chryztof Knecht, filed this action, pursuant to 42 U.S.C. § 1983, alleging a violation of their civil rights. Mr. Perotti is currently incarcerated in the Southern Ohio Correctional Facility ("SOCF") in Lucasville, Ohio. Mr. Ledger was an inmate at SOCF from February 18, 1993, to March 24, 1995, and Mr. Knecht was an inmate at SOCF from May 25, 1990, to February 15, 1995. Mr. Ledger is currently an inmate at the Mans-field Correctional Institution ("Mansfield"), and Mr. Knecht is currently an inmate at the Warren Correctional Institution ("Warren"). Plaintiffs seek injunctive relief as well as compensatory and punitive damages.

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. at 2551; *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 405 (6th Cir.1992); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino,* 980 F.2d at 405.

■ As the Supreme Court stated in *Celotex,* the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Guarino,* 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino,* 980 F.2d at 405 (quoting

*InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

■ Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990).

## DISCUSSION

### I.

Mr. Perotti claims that on May 3, 1994, prison officials transferred him from Mansfield to SOCF without any prior notice. Mr. Perotti argues that this transfer violated the Due Process Clause of the Fourteenth Amendment.

According to Ohio Administrative Code § 5120-9-21, "[a]n inmate to be transferred shall be given at least twenty-four hours notice, when practicable...."[1] Defendants state that they transferred Mr. Perotti, a maximum security inmate, to SOCF as part of a mass administrative transfer and that notice was not practicable in this instance.

The Supreme Court recently reexamined the inquiry a court must make when analyzing due process claims in the prison setting. *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In *Sandin,* a prisoner, Demont Conner, physically and verbally resisted a strip search. A disciplinary committee found Conner guilty of serious misconduct and ordered him to spend thirty days in segregation. The disciplinary committee denied Conner's request to present witnesses at the hearing. *Id.* at ——–——, 115 S.Ct. at 2295–96. Conner then filed suit alleging a violation of his procedural due process rights. Conner argued that he had a liberty interest to remain free from segregative control.

The District Court granted summary judgment in favor of the prison officials. The Court of Appeals for the Ninth Circuit reversed the District Court and found that Conner "had a liberty interest in remaining free from disciplinary segregation and that there was a disputed question of fact with respect to whether Conner received all the process due under the [Supreme Court's] pronouncement in *Wolff v. McDonnell,* 418 U.S. 539, 566 [94 S.Ct. 2963, 2979, 41 L.Ed.2d 935] (1974)." *Id.* at ——, 115 S.Ct. at 2296. The Ninth Circuit "based its conclusion on a prison regulation that instructs the committee to find guilt when a charge of misconduct is supported by substantial evidence." *Id.* at ——, 115 S.Ct. at 2296. The Ninth Circuit reasoned that the committee's duty to find guilt was "nondiscretionary" and it "may not impose segregation if it does not find substantial evidence of misconduct." *Id.* at ——–——, 115 S.Ct. at 2296–97. Consequently, the Ninth Circuit found that Conner had a state-created liberty interest and was entitled to call witnesses pursuant to the Supreme Court's opinion in *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974).

The Supreme Court reversed the Ninth Circuit and abandoned the framework it had used for more than a decade in analyzing when due process violations occurred in prison. The Supreme Court found that the old due process approach caused courts, such as the Ninth Circuit, to lay emphasis on a "somewhat mechanical dichotomy." *Id.* at ——, 115 S.Ct. at 2298. Under the old approach, courts would analyze the language of state prison regulations rather than the nature of the deprivation. *Id.* at ——, 115 S.Ct. at 2299. The courts would ascertain whether the state statute created a liberty interest by attempting to determine whether the statutory language was mandatory or discretionary. *Id.* at ——, 115 S.Ct. at 2298. "By shifting the focus of the liberty interest inquiry ... the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Id.*

---

1. The language "when practicable" indicates that this provision is not mandatory, but rather is discretionary. There may be many reasons when notice is not practicable, including the fact that prison officials may worry that giving such notice may create a security risk.

Consequently, the Supreme Court enunciated a new framework to analyze due process violations.

■■ The new framework focuses solely upon the liberty interest lost, rather than upon the regulatory language. *Id.* An inmate can only claim a procedural due process violation if the liberty interest he has lost is one of "real substance." *Id.* at ——, 115 S.Ct. at 2297 (citing *Wolff,* 418 U.S. at 557, 94 S.Ct. at 2975). Furthermore, while the language of a state statute can create a liberty interest for the general public, the same is not necessarily true of a prison regulation. *Id.* at ——, 115 S.Ct. at 2298. States can only create liberty interests grounded in the Due Process Clause of the Fourteenth Amendment in certain circumstances.

■ In fact, after *Sandin* only two instances exist where a prisoner can claim a protected liberty interest under the Due Process Clause. *Id.* at ——, 115 S.Ct. at 2300. The first is when the prison's actions have the effect of altering the term of imprisonment. *Id.* Any action taken by prison officials that lengthens an inmate's sentence raises due process concerns. If this does not occur, a court can still find a liberty interest protected by the Due Process Clause if the prison's restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

Mr. Perotti's transfer to SOCF did not affect the term of his imprisonment. Consequently, we must focus on whether Mr. Perotti's transfer without notice "impose[d] atypical and significant hardship on [Mr. Perotti] in relation to the ordinary incidents of prison life." *Id.* In *Sandin,* the Supreme Court failed to define its new test. The Supreme Court, however, did find that Mr. Conner's sentence did not impose an "atypical and significant hardship" because it "did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." *Id.* at ——, 115 S.Ct. at 2301. The Supreme Court focused upon whether the change in confinement presented a "dra-matic departure" from the basic conditions of Conner's sentence. *Id.* at ——, 115 S.Ct. at 2300.

■ In the case at bar, we find that Mr. Perotti's transfer to SOCF is not a "dramatic departure" from the basic conditions of his sentence. Ohio often transfers high security inmates to SOCF, and in this instance the prison officials made the transfer for administrative and security reasons. Transfers to less amenable quarters for non-punitive reasons is "ordinarily contemplated by a prison sentence." *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Therefore, Mr. Perotti's transfer was an ordinary incident of prison life, and the fact that he did not receive timely notice did not create an "atypical and significant hardship." [2] In fact, once Mr. Perotti arrived at SOCF, he was allowed to appeal his transfer. He did so, and his appeal was denied. Therefore, the prison still gave Mr. Perotti some minimal process, even though it was unnecessary.

■■ Mr. Perotti also argues that being transferred back to SOCF, where he was once beaten, creates an "atypical and significant hardship." Inmates, however, do not have a constitutional right to choose a prison, or to prevent prison officials from transferring them to a particular prison. *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (holding that transfer to a maximum security facility was "within the normal limits or range of custody which the conviction had authorized the State to impose"). Prison officials have discretion in choosing where to place maximum security inmates. The Courts should not interfere in this discretion absent a clear violation of a constitutional right. *See Sandin,* —— U.S. at ——, 115 S.Ct. at 2299 (Involvement of federal courts in day-to-day management of prisons often squanders judicial resources "with little offsetting benefit to anyone.").

Tension between guards and inmates is always present. *See Wolff v. McDonnell,* 418 U.S. 539, 562, 94 S.Ct. 2963, 2977, 41 L.Ed.2d

---

**2.** The Defendants also submitted a letter from Mr. Perotti to the chief of classification. The letter was two months prior to transfer, and in the letter Mr. Perotti reveals that he knew of the impending transfer.

935 (1974) ("Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace."). With this in mind, prison officials must often shift a prisoner's residence. Consequently, the prisoners do not have a constitutional right to choose what institution they live in.

Thus, we GRANT Defendants' Motion for Summary Judgment on this issue.

## II.

On September 9, 1993, the Rules Infraction Board ("RIB") at Mansfield found Mr. Perotti guilty of two rules infractions. The alleged rules infractions were (1) possession or manufacture of a weapon or contraband, and (2) threats without a weapon or force. Mr. Perotti appealed the RIB's decision to the Director of Disciplinary Appeal, pursuant to Ohio Adm.Code § 5120–9–09(M). According to section 5120–9–09(M), "[t]he inmate shall file his appeal to the director within fifteen days ... [and] ... The director or his designee will act upon the appeal in writing within thirty days."

The Director, Reginald Wilkinson, did not act until March 17, 1994.[3] When he finally did act, he reversed the decision of the RIB, because he could not obtain the RIB's complete record. He concluded that if the RIB chooses not to recharge Mr. Perotti, Mr. Perotti's record should be expunged. The RIB never recharged Mr. Perotti. On April 7, 1994, however, Mr. Wilkinson discovered the file and reversed his previous ruling, thus affirming the RIB's decision.

Mr. Perotti argues Mr. Wilkinson's final reversal was a violation of his due process rights. Specifically, he claims that Mr. Wilkinson was required to issue a ruling within

thirty days and he failed do so, and that according to the statute Mr. Wilkinson's original decision "shall be final and shall be a bar to further appeal." Ohio Adm.Code § 5120–9–09(M).

Before the Court can look to the process given, we must first determine whether Mr. Wilkinson's actions affected a liberty interest. The guilty finding must have either extended Mr. Perotti's term of imprisonment or caused a "significant, atypical hardship." After reviewing all of the briefs, we find that neither party has presented sufficient facts for this Court to grant summary judgment in their favor.

Neither party has adequately advised the Court whether Mr. Wilkinson's actions extended Mr. Perotti's prison sentence.[4] Furthermore, the Plaintiffs claim that Mr. Perotti was in disciplinary control for "months," Plaintiffs' Motion for Summary Judgment, Document 46 at 8. The Defendants failed to respond to this allegation in their brief. Ohio Administrative Code sections 5120–9–08(C) and (D), however, both provide that an inmate shall not serve more than thirty days in disciplinary control. Neither side has argued whether this segregation imposed a "significant, atypical hardship." Thus, in light of the new standard enunciated in *Sandin,* and the remaining factual issues, this Court DENIES both parties' motions for summary judgment on this issue.

## III.

Next, the Plaintiffs allege the Defendants violated their First Amendment Rights, when the Defendants denied the Plaintiffs access to the *Prison News Service* and the *People's Tribune.*[5] Ohio Administrative

---

**3.** Defendants argue that Mr. Wilkinson did not act at all, but rather that his designee, Cheryl Jorgenson, signed his name and acted on his behalf. If Ms. Jorgenson was acting on her own behalf or as his designee, she should have signed in her own name. Since Mr. Wilkinson's signature appears on the documents, the Plaintiffs properly filed suit against him.

**4.** Section 5120–9–09(N) provides that a disciplinary decision is placed in an inmate's file only when a guilty verdict is reached. Ohio Adm. Code § 5120–9–09(N). The Court, however, has

not been advised whether this would extend an inmate's sentence.

**5.** In their complaint, the Plaintiffs request access to all prison newsletters that they have ordered, which do not cause security problems. In their motion for summary judgment, however, at one point they claim they were denied all of the newsletters, but then only ask for three in relief. To prevent multiple motions, we have addressed all of the newsletters that they requested to receive in their complaint.

Code § 5120–9–19(D) provides in pertinent part:

> (D) Printed material may be excluded from an institution for one or both of the following reasons: ... (2) The printed material is inflammatory; that is the printed material would be detrimental to security, good order or discipline of the institution, or would facilitate criminal activity. No publication shall be considered inflammatory solely on the basis of its appeal to a particular ethnic, racial or religious audience. In order to be considered inflammatory, the printed material *must* meet at least one of the following criteria: (a) Printed material which incites, aids, or abets criminal activity, such as rioting or illegal drug use. (b) Printed material which incites, aids or abets violence against others, including instruction in making, using, or converting weapons....

The Plaintiffs do not challenge the constitutionality of this section, but instead challenge it as applied. The relevant inquiry is "whether the actions of the prison official were 'reasonably related to legitimate penological interests.'" *Thornburgh v. Abbott,* 490 U.S. 401, 409, 109 S.Ct. 1874, 1879, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)). "Such a standard is necessary if prison administrators ..., and not the courts [are] to make the difficult judgments concerning institutional operations." *Id.* (citations omitted).

■ The substantial deference accorded prison officials, however, does not relieve federal courts from their duty to ensure that prison officials' actions are not exaggerated responses to prison concerns. *Salaam v. Lockhart,* 905 F.2d 1168, 1171 (8th Cir.1990). This is especially true in the First Amendment area, where prison officials may attempt "to eliminate unflattering or unwelcome opinions [and] apply their own personal prejudices and opinions...." *Procunier v. Martinez,* 416 U.S. 396, 413, 415, 94 S.Ct. 1800, 1811, 1812, 40 L.Ed.2d 224 (1974), *overruled in part by Abbott,* 490 U.S. 401, 109 S.Ct. 1874 (overruled test used on incoming mail); *see also Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 235, 107 S.Ct.

1722, 1730, 95 L.Ed.2d 209 (1987) (Scalia, J., dissenting) ("All government displays an enduring tendency to silence, or to facilitate silencing, those voices it disapproves."). Additionally, the First Amendment plays a unique and special role in the prison environment. Such freedoms taken for granted in the free world, assume great significance behind bars. Prisoners often remain in their cell between fifteen and twenty hours a day with very little to do. The opportunity to read and write allows a prisoner to remain in touch with the outside world, and provides the opportunity for a prisoner to nourish his mind despite the bleakness of his environment. Most importantly, it allows prisoners to channel tensions and frustrations into something positive and peaceful.

■ Against this background, we must analyze the reasonableness of the prison official's decisions in this case. The Court must determine whether the banning of each publication is reasonably related to a legitimate penological interest. Of course, legitimate interests include prison safety and preventing criminal activity. *See Abbott,* 490 U.S. at 415, 109 S.Ct. at 1882. Therefore, once the prison officials express such an interest, courts should focus on whether the particular publications incite lawless action or just encourage peaceful and legal protests. If articles are critical of prison officials, but encourage peaceful, proper and legal protests, then banning them would usually not be related to prison security. As one district court said:

> Time and again, one finds that banned publications do not advocate criminal behavior or prison disruption, are not obscene, and do not instruct bomb-building, liquor-brewing, lock-picking, escape-planning or other dangerous activities. Rather, they express views of racial, religious, political and sexual minorities or contain information and opinion negatively reflecting on authority figures or prison officials. Case law is replete with examples of overbroad censorship. In addition to its potential to sweep too broadly, prison censorship is occasionally absurd.

*Lyon v. Grossheim,* 803 F.Supp. 1538, 1551 (S.D.Iowa 1992) (internal citations omitted). There are times, however, when the language

of the article can be inflammatory to a point where the language itself raises legitimate penological concerns.

In this case, Lieutenant Charles Schramm is in charge of deciding what mail should be withheld from the inmates. Lieutenant Schramm has withheld the *Prison News Service* from May/June 1994, through the present, and withheld the September 12, 1994, issue of *People's Tribune*.

### 1. *Prison New Service,* May/June 1994

Lieutenant Schramm withheld the May/June 1994, issue of *Prison News Service* because he claims the "entire newspaper incites unrest and overthrow of Ohio's penal system." Internal security of the prison is a legitimate government interest. Therefore, the focus falls on whether it was reasonable for Lieutenant Schramm to conclude that the contents of the issue would "incite unrest or overthrow of Ohio's penal institution."

 After closely reviewing the May/June 1994, issue, the Court finds that while some of the articles may be critical of prison officials or government administrations, they do not rise to the level of inciting or advocating dissention. The articles only encourage letter writing to the Governor or other prison officials in protest of certain conditions. The articles appear to incite prisoners to use peaceful and lawful means to overcome adverse conditions. We find that the May/June issue of *Prison News Service* does not incite unrest or an overthrow of the penal system, but instead encourages peaceful protests. Consequently, banning the May/June issue is not rationally related to a legitimate penological interest.

### 2. *Prison News Service,* September/October 1994

 Lieutenant Schramm denied the prisoners the September/October issue because it contained an article critical of him and also contained other inflammatory articles. The article criticizing Lieutenant Schramm does not incite unlawful action or prison unrest, but instead asks for letters of protest.[6] Lieutenant Schramm, however, correctly withheld the September/October issue because the second article "Spilt Milk—Lucasville 1994" advocates hostile takeovers. Specifically, it states "[t]he affirmative defense of self defense/justification should be a viable option for the Brothers to illustrate that the conditions were so oppressive that the takeover was necessary to save their lives." *Prison News Service,* September/October 1994, at 1. Thus, Lieutenant Schramm's denial of the September/October issue was rationally related to a legitimate penological interest.

### 3. *Prison News Service,* November/December 1994

Lieutenant Schramm properly withheld the November/December 1994, issue because it advocated a hostile overthrow of SOCF. Specifically, an article on page 4 advocates prisoners to "break the walls down."

### 4. *Prison News Service,* January/February 1995

Lieutenant Schramm withheld this issue because he found the article on page 13 entitled "The Black Revolutionary and International Law" to be inflammatory and arouse racial tensions. The article encourages people to "act" and "resist." Furthermore, the article speaks of a white supremacist regime, and an overthrow of that regime. The language contained within the article definitely attempts to incite action against the current United States government, which would include prison authorities. Consequently, barring this publication is rationally related to a legitimate penological interest.

### 5. *Prison News Service,* March/April 1995

Lieutenant Schramm did not give a reason for withholding the March/April issue. Prison officials cannot deny inmates their First Amendment rights without a legitimate reason. Accordingly, this issue of the *Prison News Service* should be given to Mr. Perotti.

---

**6.** An inmate who passively reads an article in his cell, which advocates peaceful protest of prison policy, will not be aroused to lawless action. In fact, Lieutenant Schramm admits that he has never seen an article provoke violence at SOCF. Schramm Deposition at 54.

6. *People's Tribune,* September 12, 1994

██ Lieutenant Schramm denied Mr. Ledger this issue of *People's Tribune* because he claims that the issue is "anti-government" and "anti-establishment" and "in the hands of some of the inmates ... could provoke violence." Schramm Deposition at 53. After closely reviewing the *People's Tribune,* the Court could not find one article that supported Mr. Schramm's claims. While preventing violence is definitely a legitimate interest, none of the articles incites violence. Most of the articles are political statements about such things as the cost of housing a prisoner for life, a seven year-old's sad life as a son of someone on death row, and a mother who is fighting to be able to visit her son in prison. Banning this publication will not increase prison security. Consequently, the *People's Tribune* issue should be turned over to Mr. Ledger.

7. Conclusion

Accordingly, we hereby GRANT in part and DENY in part the Plaintiffs' motion for summary judgment on this issue, and GRANT in part and DENY in part the Defendants' motion for summary judgment on this issue. We ORDER that the prison relinquish the May/June 1994, and March/April 1995, issue of *Prison News Service* to Mr. Perotti. Additionally, we ORDER that the prison relinquish the September 12, 1994, issue of *People's Tribune* to Mr. Ledger.

**IV.**

Plaintiffs Perotti and Knecht claim that they have been denied meaningful access to the courts. After the Lucasville riots in April, 1993, until late 1994, prisoners in administrative control at SOCF could only receive materials through the kite paging system. In late 1994, SOCF provided two paralegals to assist prisoners in the control status cellblocks with their legal work.[7] At SOCF inmates in control blocks must make written requests for "legal materials, typing, or assistance." SOCF Policy and Procedures, at 3. The Plaintiffs claim that such a procedure is

unconstitutional because the system violates their right to "adequate, effective, and meaningful" access to the courts. *See Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977).

██ It is well established that prisoners have a constitutional right to access to the courts. *Id.* at 821, 97 S.Ct. at 1494. In *Bounds,* the Supreme Court held that a prisoner's right of access to the courts requires prison authorities to provide prisoners with adequate law libraries or adequate legal assistance from persons trained in the law. *Id.* at 828, 97 S.Ct. at 1498; *Holt v. Pitts,* 702 F.2d 639, 640 (6th Cir.1983). We find that the system currently at Lucasville is constitutional.

██ Security is a constant concern in prison, even within the law library. Nonetheless, prison officials cannot deny inmates "meaningful access" to the courts. They can, however, provide inmates in control status cellblocks alternative means of access to the law library. Here, Plaintiffs' access to legal materials is not significantly impeded. The prison authorities have provided the inmates in control status cellblocks with two paralegals and the opportunity to use the kite system to obtain books. *See Holt,* 702 F.2d at 640–41 (state can deny access to library for security reasons, when state provides the assistance of legally-trained personnel); *Williams v. Wyrick,* 747 F.2d 1231, 1232 (8th Cir.1984) (state satisfied *Bounds* by providing two inmate paralegals and one runner to procure law books, copy materials and research legal questions for twenty-three death-row inmates); *Corgain v. Miller,* 708 F.2d 1241, 1247–50 (7th Cir.1983) (where state actually provided legal assistance, access to legal materials could be restricted). The Court recognizes that two paralegals and the kite system may not be as good as direct access to the law library, but we find it is sufficient for prisoners deemed security risks at a maximum security prison such as SOCF.

---

**7.** From the Plaintiffs' brief, it appears that only Mr. Perotti believes the current system is unconstitutional.

Additionally, the Plaintiffs contest the system used after the riots in 1993, but prior to the addition of the paralegals in late 1994, is unconstitutional. Warden Collins admitted that after the riots the entire library was shutdown, and everyone had to use the kite system until the middle of 1994. Under normal circumstances, such a system would be unconstitutional. *Toussaint v. McCarthy,* 801 F.2d 1080, 1109 (9th Cir.1986). The Court, however, cannot look solely at the denial of the use of the law library, but instead must consider the legitimate penological objectives of the prison. In this instance, the Warden had a number of heightened security concerns after SOCF had a deadly riot. Riots definitely justify heightened restrictions. Such restrictions may include a temporary limit of access to the law library.

Once the Warden believed it was safe in about June of 1994, he reopened the law library for the general population. Then in late 1994, the Warden hired two paralegals to accommodate the prisoners in the control status cellblocks, who could still only obtain legal materials through the kite paging system. Accordingly, we find the Warden's actions were proper in light of the recent riot at SOCF.

The Court hereby GRANTS the Defendants' motion for summary judgment on this issue.

## V.

The Plaintiffs claim that Defendants Brian Cox and Michael Turner have repeatedly issued death threats and harassed Plaintiffs Knecht and Perotti. Additionally, the Plaintiffs claim that Mr. Cox and Mr. Turner have told other inmates that Mr. Perotti and Mr. Knecht are "snitches," in an attempt to incite inmate retaliation against Mr. Perotti and Mr. Knecht. The Defendants argue that even if the Plaintiffs' claims are correct, they do not have a cause of action, and thus, summary judgment should be granted for the Defendants. We disagree.

Defendants rely upon *Ivey v. Wilson,* 832 F.2d 950 (6th Cir.1987). In *Ivey,* the Sixth Circuit found that verbal abuse and harassment does not rise to the level of cruel and unusual punishment under the Eighth Amendment. *Id.* at 955. The Plaintiffs, however, do not claim that the death threats and harassment were cruel and unusual punishment, but rather claim that the threats violated their First and Fourteenth Amendment Rights. Specifically, the Plaintiffs claim that the Defendants threatened them because the Plaintiffs filed lawsuits that contested prison conditions and wrote articles critical of the prison administration.

As discussed above, inmates have a right to access to the courts and to a limited freedom of speech. The Sixth Circuit has held that the "egregious abuse of governmental power" in the form of prison officials' retaliation against an inmate for exercising his right to complain about inadequate prison policies (bad food), was sufficient to state a claim for deprivation of rights in violation of 42 U.S.C. § 1983. *Cale v. Johnson,* 861 F.2d 943, 949–50 (6th Cir.1988). The Sixth Circuit went on to state that "an inmate need not show a court the scars of torture in order to make out a complaint under section 1983." *Id.* at 951. Finally, it only seems logical that a prisoner may exercise his constitutional rights without fear or threats of death. "[A] prisoner retains at least the right to be free from the terror of instant and unexpected death at the whim of his allegedly bigoted custodians." *Id.* at 950 (quoting *Burton v. Livingston,* 791 F.2d 97, 100 (8th Cir.1986)). Thus, the Plaintiffs have stated a cause of action under section 1983.

Additionally, the Plaintiffs claim the Defendants retaliated against them by labeling them as "snitches," thereby subjecting them possible retaliation from other inmates. Inmates have a right to be protected from violence while in custody. " '[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.' " *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir.1988)). If prison officials called the Plaintiffs "snitches" in order to subject them to inmate retaliation, a jury could find the Defendants liable. *See Valandingham v. Bojorquez,* 866 F.2d

1135, 1138 (9th Cir.1989) ("If the facts alleged ... are true, he may have a claim under section 1983 not only for violation of his right to be protected from violence while in custody, but also for a violation of his right of access to the courts."). Therefore, based on the facts alleged in the complaint and supported by affidavits, a genuine issue of fact exists and summary judgment is not appropriate.

Accordingly, we DENY Defendants' motion for summary judgment on this issue.

## VI.

■ Finally, the Plaintiffs claim that prison authorities framed and improperly disciplined them in retaliation for pursuing their constitutional rights and for their activism in the field of prisoner civil rights. The Defendants argue that the Plaintiffs were properly punished for legitimate rule violations. This is a factual dispute that the Court cannot resolve on a motion for summary judgment.

■ Prison authorities cannot frame and then improperly discipline prisoners for exercising their constitutional rights. *Cale*, 861 F.2d at 949–950. Defendants do not contest the law, but instead argue that Plaintiffs' facts are merely conclusory and have no support. At one point, however, the Warden himself overturned one of Mr. Perotti's convictions for allegedly smuggling talwyn pills out of the prison. Warden Collins said, "The final end result, I was not satisfied in my mind ... that, in fact the case was proper.... [t]hat's why I overturned that decision." Deposition of Terry Collins at 15. Therefore, the Plaintiffs do have enough evidence to create an issue of fact.

Consequently, we DENY Defendants' motion for summary judgment on this issue.

## CONCLUSION

Accordingly, we hereby GRANT the Defendants' motion for summary judgment on Mr. Perotti's claim of improper transfer from Mansfield to SOCF, and on the Plaintiffs' claim that they were improperly denied access to the law library. Additionally, we GRANT in part and DENY in part the De-

fendants' motion for summary judgment on the Plaintiffs' First Amendment claim of access to certain publications, and GRANT in part and DENY in part the Plaintiffs' motion for summary judgment on their claim of access to certain publications. We DENY both parties' motions for summary judgment on Mr. Perotti's claim that Mr. Wilkinson violated his due process rights by ultimately affirming the RIB decision. Finally, we DENY the Defendants' motions for summary judgment on the Plaintiffs' retaliation claims.

Consequently, several factual issues remain for trial in Counts IV and V of the Amended Complaint. First, in Count V a factual question exists whether Mr. Wilkinson's actions extended Mr. Perotti's prison sentence. Also in Count V, factual questions exist as to how long Mr. Perotti was in segregation and whether this caused an "atypical, significant hardship." If the Plaintiffs can prove either of these, then a factual question exists whether Mr. Perotti received due process. Second, in Count IV a factual question exists whether the Defendants retaliated against the Plaintiffs for exercising their constitutional rights, by either framing them, threatening them or attempting to cause them harm.

SO ORDERED.