(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BEARD, SECRETARY, PENNSYLVANIA DEPARTMENT OF CORRECTIONS *v.* BANKS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 04–1739.   Argued March 27, 2006—Decided June 28, 2006

Pennsylvania houses its 40 most dangerous and recalcitrant inmates in a Long Term Segregation Unit (LTSU).  Inmates begin in level 2, which has the most severe restrictions, but may graduate to the less restrictive level 1.  Plaintiff-respondent Banks, a level 2 inmate, filed this federal-court action against defendant-petitioner, the Secretary of the Department of Corrections, alleging that a level 2 policy (Policy) forbidding inmates any access to newspapers, magazines, and photographs violates the First Amendment.  During discovery, Banks deposed Deputy Prison Superintendent Dickson and the parties introduced prison policy manuals and related documents into the record.  The Secretary then filed a summary judgment motion, along with a statement of undisputed facts and the deposition.  Rather than filing an opposition to the motion, Banks filed a cross-motion for summary judgment, relying on the undisputed facts, including those in the deposition.  Based on this record, the District Court granted the Secretary's motion and denied Banks'.  Reversing the Secretary's summary judgment award, the Third Circuit held that the prison regulation could not be supported as a matter of law.

*Held:* The judgment is reversed, and the case is remanded.

399 F. 3d 134, reversed and remanded.

   JUSTICE BREYER, joined by THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE SOUTER, concluded that, based on the record before this Court, prison officials have set forth adequate legal support for the Policy, and Banks has failed to show specific facts that could warrant a determination in his favor.  Pp. 5–13.

(a) *Turner* v. *Safley,* 482 U. S. 78, and *Overton* v. *Bazzetta,* 539 U. S. 126, contain the basic substantive legal standards covering this case. While imprisonment does not automatically deprive a prisoner of constitutional protections, *Turner,* 482 U. S., at 93, the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere, *id.,* at 84–85. As *Overton, supra,* at 132, pointed out, courts also owe "substantial deference to the professional judgment of prison administrators." Under *Turner,* restrictive prison regulations are permissible if they are "reasonably related to legitimate penological interests." 482 U. S*.,* at 89. Because this case is here on the Secretary's summary judgment motion, the Court examines the record to determine whether he has demonstrated "the absence of a genuine issue of material fact" and his entitlement to judgment as a matter of law. See, *e.g.,* Fed . Rule Civ. Proc. 56. If he has, the Court determines whether Banks has "by affidavits or as otherwise provided" in Rule 56, "set forth specific facts showing . . . a genuine issue for trial," Rule 56(e). Inferences about disputed facts must be drawn in Banks' favor, but deference must be accorded prison authorities' views with respect to matters of professional judgment. Pp. 5–6.

(b) The Secretary rested his motion primarily on the undisputed facts statement and Dickson's affidavit. The first of his justifications for the Policy—the need to motivate better behavior on the part of particularly difficult prisoners—sufficiently satisfies *Turner*'s requirements. The statement and affidavit set forth a "'valid, rational connection '" between the Policy and "'legitimate penological interests,'" 482 U. S., at 89, 95. Dickson noted that prison authorities are limited in what they can and cannot deny or give a level 2 inmate, who has already been deprived of most privileges, and that the officials believe that the specified items are legitimate as incentives for inmate growth. The undisputed facts statement added that the Policy encourages progress and discourages backsliding by level 1 inmates. These statements point to evidence that the regulations serve the function identified. The articulated connections between newspapers and magazines, the deprivation of virtually the last privilege left to an inmate, and a significant incentive to improve behavior, are logical ones. Thus, this factor supports the Policy's "reasonableness." The second, third, and fourth *Turner* factors—whether there are "alternative means of exercising the right that remain open to prison inmates," *id*., at 90; the "impact" that accommodating "the asserted constitutional right [will] have on guards and other inmates, and on the allocation of prison resources," *ibid*.; and whether there are "ready alternatives" for furthering the governmental interest, *ibid*.— add little to the first factor's logical rationale here. That two of these

three factors seem to favor the Policy therefore does not help the Sec-
retary. The real task in this case is not balancing the *Turner* factors
but determining whether the Secretary's summary judgment mate-
rial shows not just a logical relation but a *reasonable* relation. Given
the deference courts must show to prison officials' professional judg-
ment, the material presented here is sufficient. *Overton* provides
significant support for this conclusion. In both cases, the depriva-
tions (family visits in *Overton* and access to newspapers, magazines,
and photographs here) have an important constitutional dimension;
prison officials have imposed the deprivation only upon those with
serious prison-behavior problems; and those officials, relying on their
professional judgment, reached an experience-based conclusion that
the policies help to further legitimate prison objectives. Unless there
is more, the Secretary's supporting material brings the Policy within
*Turner*'s scope. Pp. 6–10.

(c) Although summary judgment rules gave Banks an opportunity
to respond to these materials, he did not do so in the manner the
rules provide. Instead, he filed a cross-motion for summary judg-
ment, arguing that the Policy fell of its own weight. Neither the
cases he cites nor the statistics he notes support his argument. In
reaching a contrary conclusion, the Third Circuit placed too high an
evidentiary burden on the Secretary and offered too little deference to
the prison officials' judgment. Such deference does not make it im-
possible for those attacking prison policies to succeed. A prisoner
may be able to marshal substantial evidence, for example through
depositions, that a policy is not reasonable or that there is a genuine
issue of material fact for trial. And, as *Overton* noted*,* if faced with a
*de facto* permanent ban involving a severe restriction, this Court
might reach a different conclusion. Pp. 10–13.

JUSTICE THOMAS, joined by JUSTICE SCALIA, concluded that, using
the framework set forth in JUSTICE THOMAS' concurrence in *Overton* v.
*Bazzetta,* 539 U. S. 126, 138, Pennsylvania's prison regulations are
permissible. That framework provides the least perilous approach for
resolving challenges to prison regulations and is the approach most
faithful to the Constitution. "Sentencing a criminal to a term of im-
prisonment may . . . carry with it the implied delegation to prison of-
ficials to discipline and otherwise supervise the criminal while he is
incarcerated." *Id.,* at 140, n. A term of imprisonment in Pennsyl-
vania includes such an implied delegation. Inmates are subject to
Department of Corrections rules and disciplinary rulings, and the
challenged regulations fall with the Department's discretion. This
conclusion is supported by the plurality's *Turner* v. *Safley,* 482 U. S.
78, analysis. The "history of incarceration as punishment [also] sup-
ports the view that the sentenc[e] . . . terminated" respondent's unfet-

Syllabus

tered right to magazines, newspapers, and photographs. *Overton,* 539 U. S., at 142. While Pennsylvania "is free to alter its definition of incarceration to include the retention" of unfettered access to such materials, it appears that the Commonwealth instead sentenced respondent against the backdrop of its traditional conception of imprisonment, which affords no such privileges. *Id.,* at 144–145. Pp. 1–7.

BREYER, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and KENNEDY and SOUTER, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined. GINSBURG, J., filed a dissenting opinion. ALITO, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–1739

———————

## JEFFREY A. BEARD, SECRETARY, PENNSYLVANIA DEPARTMENT OF CORRECTIONS, PETITIONER *v.* RONALD BANKS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 28, 2006]

JUSTICE BREYER announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE SOUTER join.

We here consider whether a Pennsylvania prison policy that "denies newspapers, magazines, and photographs" to a group of specially dangerous and recalcitrant inmates "violate[s] the First Amendment." Brief for Petitioner i; see *Turner* v. *Safley,* 482 U. S. 78, 89 (1987) (prison rules restricting a prisoner's constitutional rights must be "reasonably related to legitimate penological interests"). The case arises on a motion for summary judgment. While we do not deny the constitutional importance of the interests in question, we find, on the basis of the record now before us, that prison officials have set forth adequate legal support for the policy. And the plaintiff, a prisoner who attacks the policy, has failed to set forth "specific facts" that, in light of the deference that courts must show to the prison officials, could warrant a determination in his favor. Fed. Rule Civ. Proc. 56(e); *Overton* v. *Bazzetta,* 539

U. S. 126, 132 (2003) (need for "substantial deference to the professional judgment of prison administrators").

# I
## A

The prison regulation at issue applies to certain prisoners housed in Pennsylvania's Long Term Segregation Unit. The LTSU is the most restrictive of the three special units that Pennsylvania maintains for difficult prisoners. The first such unit, the "Restricted Housing Unit," is designed for prisoners who are under disciplinary sanction or who are assigned to administrative segregation. App. 80. The second such unit, the "Special Management Unit," is intended for prisoners who "exhibit behavior that is continually disruptive, violent, dangerous or a threat to the orderly operation of their assigned facility." *Ibid.* The third such unit, the LTSU, is reserved for the Commonwealth's "most incorrigible, recalcitrant inmates." *Id.*, at 25.

LTSU inmates number about 40. *Id.*, at 127. Most, but not all, have "flunked out" of the SMU program. *Id.*, at 137. To qualify, they must have met one or more of the following conditions: failure to "complete" the SMU program; "assaultive behavior with the intent to cause death or serious bodily injury"; causing injury to other inmates or staff; "engaging in facility disturbance(s)"; belonging to an unauthorized organization or "Security Threat Group"; engaging in criminal activity that "threatens the community"; possessing while in prison "weapons" or "implements of escape"; or having a history of "serious" escape attempts, "exerting negative influence in facility activities," or being a "sexual predator." *Id.*, at 85–86. The LTSU is divided into two levels. All inmates are initially assigned to the most restrictive level, level 2. After 90 days, depending upon an inmate's behavior, an individual may graduate to the less restrictive level 1, although in

practice most do not. *Id.*, at 131–132, 138.

The RHU, SMU, and LTSU all seriously restrict inmates' ordinary prison privileges. At all three units, residents are typically confined to cells for 23 hours a day, have limited access to the commissary or outside visitors, and (with the exception of some phases of the SMU) may not watch television or listen to the radio. *Id.*, at 102; Brief for Petitioner 2–4.

Prisoners at level 2 of the LTSU face the most severe form of the restrictions listed above. They have no access to the commissary, they may have only one visitor per month (an immediate family member), and they are not allowed phone calls except in emergencies. App. 102. In addition they (unlike all other prisoners in the Commonwealth) are restricted in the manner at issue here: They have no access to newspapers, magazines, or personal photographs. *Id.*, at 26. They are nonetheless permitted legal and personal correspondence, religious and legal materials, two library books, and writing paper. *Id.*, at 35, 102, 169. If an inmate progresses to level 1, he enjoys somewhat less severe restrictions, including the right to receive one newspaper and five magazines. *Id.*, at 26, 102. The ban on photographs is not lifted unless a prisoner progresses out of the LTSU altogether. *Ibid.*

B

In 2001, plaintiff Ronald Banks, respondent here, then a prisoner confined to LTSU level 2, filed this federal-court action against Jeffrey Beard, the Secretary of the Pennsylvania Department of Corrections. See Rev. Stat. §1979, 42 U. S. C. §1983. Banks claimed that the level 2 Policy forbidding inmates all access to newspapers, magazines, and photographs bears no reasonable relation to any legitimate penological objective and consequently violates the First Amendment. App. 15; see also *Turner, supra; Overton, supra.* The Secretary, the defendant, petitioner

here, filed an answer. The District Court certified a class composed of similar level 2 inmates, and the court assigned the case to a Magistrate who conducted discovery.

Banks' counsel deposed a deputy superintendent at the prison, Joel Dickson. The parties introduced various prison policy manuals and related documents into the record. And at that point the Secretary filed a motion for summary judgment. He also filed a "Statement of Material Facts Not in Dispute," with a copy of the deputy superintendent's deposition attached as an appendix. See App. 25; Rule 56.1(C)(1) (WD Pa. 2006).

Banks (who was represented by counsel throughout) filed no opposition to the Secretary's motion, but instead filed a cross-motion for summary judgment. Neither that cross-motion nor any other of Banks' filings sought to place any significant fact in dispute, and Banks has never sought a trial to determine the validity of the Policy. Rather, Banks claimed in his cross-motion that the undisputed facts, including those in Dickson's deposition, entitled him to summary judgment. In this way, and by failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, Banks is deemed to have admitted the validity of the facts contained in the Secretary's statement. See Rule 56.1(E).

On the basis of the record as described (the complaint, the answer, the statement of undisputed facts, other agreed-upon descriptions of the system, the Dickson deposition, and the motions for summary judgment), the Magistrate recommended that the District Court grant the Secretary's motion for summary judgment and deny that of Banks. App. to Brief in Opposition 130. The District Court accepted the Magistrate's recommendation. *Id.*, at 131–132.

On appeal, a divided Third Circuit panel reversed the District Court's award of summary judgment to the Secretary. 399 F. 3d 134 (2005). The majority of the panel held

that the prison regulation "cannot be supported as a matter of law by the record in this case." *Id.*, at 148; see also *infra*, at 14–15. The Secretary sought our review of the Appeals Court's judgment, and we granted his petition. 546 U. S. ___ (2005).

## II

*Turner* v. *Safley,* 482 U. S. 78 (1987), and *Overton* v. *Bazzetta,* 539 U. S 126 (2003), contain the basic substantive legal standards governing this case. This Court recognized in *Turner* that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment. *Id.*, at 93; see also *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 348 (1987). But at the same time the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere. See, *e.g.*, *Turner*, *supra*, at 84–85. As *Overton* (summarizing pre-*Turner* case law) pointed out, courts owe "substantial deference to the professional judgment of prison administrators." 539 U. S., at 132. And *Turner* reconciled these principles by holding that restrictive prison regulations are permissible if they are "'reasonably related' to legitimate penological interests," 482 U. S., at 87, and are not an "exaggerated response" to such objectives, *ibid.*

*Turner* also sets forth four factors "relevant in determining the reasonableness of the regulation at issue." *Id.,* at 89. First, is there a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? *Ibid.* Second, are there "alternative means of exercising the right that remain open to prison inmates"? *Id.*, at 90. Third, what "impact" will "accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally"? *Ibid.* And, fourth, are "ready alternatives" for furthering the governmental

interest available? *Ibid.*

This case has arrived in this Court in the context of the Secretary's motion for summary judgment. Thus we must examine the record to see whether the Secretary, in depositions, answers to interrogatories, admissions, affidavits and the like, has demonstrated "the absence of a genuine issue of material fact" and his entitlement to judgment as a matter of law. See, *e.g.*, Fed. Rule Civ. Proc. 56; *Celotex Corp.* v. *Catrett,* 477 U. S. 317 (1986).

If the Secretary has done so, then we must determine whether Banks, the plaintiff, who bears the burden of persuasion, *Overton, supra*, at 132, has "by affidavits or as otherwise provided" in Rule 56 (*e.g.* through depositions, etc.) "*set forth specific facts showing that there is a genuine issue for trial.*" Rule 56(e) (emphasis added). If not, the law requires entry of judgment in the Secretary's favor. See *Celotex Corp., supra*, at 322 (Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

We recognize that at this stage we must draw "all justifiable inferences" in Banks' "favor." *Anderson* v. *Liberty Lobby, Inc.,* 477 U. S. 242, 255 (1986). In doing so, however, we must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. *Overton, supra.* Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

## III

The Secretary in his motion set forth several justifica-

tions for the prison's policy, including the need to motivate better behavior on the part of particularly difficult prisoners, the need to minimize the amount of property they control in their cells, and the need to assure prison safety, by, for example, diminishing the amount of material a prisoner might use to start a cell fire. We need go no further than the first justification, that of providing increased incentives for better prison behavior. Applying the well-established substantive and procedural standards set forth in Part II, we find, on the basis of the record before us, that the Secretary's justification is adequate. And that finding here warrants summary judgment in the Secretary's favor.

A

The Secretary rested his motion for summary judgment primarily upon the statement of undisputed facts along with Deputy Prison Superintendent Dickson's affidavit. The statement of undisputed facts says that the LTSU's 40 inmates, about 0.01 percent of the total prison population, constitute the "'worst of the worst,'" those who "have proven by the history of their behavior in prison, the necessity of holding them in the rigorous regime of confinement" of the LTSU. App. 26. It then sets forth three "penological rationales" for the Policy, summarized from the Dickson deposition:

(1) to "motivat[e]" better "behavior" on the part of these "particularly difficult prisoners," by providing them with an incentive to move to level 1, or out of the LTSU altogether, and to "discourage backsliding" on the part of level 1 inmates;

(2) to minimize the amount of property controlled by the prisoners, on the theory that the "less property these high maintenance, high supervision, obdurate troublemakers have, the easier it is for . . . correctional officer[s] to detect concealed contraband [and]

to provide security"; and

(3) to diminish the amount of material (in particular newspapers and magazines) that prisoners might use as weapons of attack in the form of "'spears'" or "'blow guns,'" or that they could employ "as tools to catapult feces at the guards without the necessity of soiling one's own hands," or use "as tinder for cell fires." *Id.*, at 27.

As we have said we believe that the first rationale itself satisfies *Turner*'s requirements. First, the statement and deposition set forth a "'valid, rational connection'" between the Policy and "'legitimate penological objectives.'" 482 U. S., at 89, 95. The deputy superintendent stated in his deposition that prison authorities are "very limited . . . in what we can and cannot deny or give to [a level 2] inmate [who typically has already been deprived of almost all privileges, see *supra*, at 2–3], and these are some of the items that we feel are legitimate as incentives for inmate growth." App. 190. The statement of undisputed facts (relying on the deposition) added that the Policy "serves to encourage . . . progress and discourage backsliding by the level 1 inmates." *Id.*, at 27.

These statements point to evidence—namely, the views of the deputy superintendent—that the regulations do, in fact, serve the function identified. The articulated connections between newspapers and magazines, the deprivation of virtually the last privilege left to an inmate, and a significant incentive to improve behavior, are logical ones. Thus, the first factor supports the Policy's "reasonableness."

As to the second factor, the statement and deposition make clear that, as long as the inmate remains at level 2, *no* "alternative means of exercising the right" remain open to him. *Turner, supra*, at 90. After 90 days the prisoner may be able to graduate to level 1 and thus regain his

access to most of the lost rights. In the approximately 2 ½ years after the LTSU opened, about 25 percent of those confined to level 2 did graduate to level 1 or out of the LTSU altogether. App. 138; Reply Brief for Petitioner 8. But these circumstances simply limit, they do not eliminate, the fact that there is no alternative. The absence of any alternative thus provides "some evidence that the regulations [a]re unreasonable," but is not "conclusive" of the reasonableness of the Policy. *Overton*, 539 U. S., at 135.

As to the third factor, the statement and deposition indicate that, were prison authorities to seek to "accommodat[e] . . . the asserted constitutional right," the resulting "impact" would be negative. That circumstance is also inherent in the nature of the Policy: If the Policy (in the authorities' view) helps to produce better behavior, then its absence (in the authorities' view) will help to produce worse behavior, *e.g.*, "backsliding" (and thus the expenditure of more "resources" at level 2). *Turner,* 482 U. S., at 90. Similarly, as to the fourth factor, neither the statement nor the deposition describes, points to, or calls to mind any "alternative method of accommodating the claimant's constitutional complaint . . . that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Id.*, at 90–91.

In fact, the second, third, and fourth factors, being in a sense logically related to the Policy itself, here add little, one way or another, to the first factor's basic logical rationale. See *post*, at 6 (opinion of STEVENS, J.) (noting that "deprivation theory does not map easily onto several of the *Turner* factors"), cf. *post*, at 5-6 (opinion of THOMAS, J.) (similar). The fact that two of these latter three factors seem to support the Policy does not, therefore, count in the Secretary's favor. The real task in this case is not balancing these factors, but rather determining whether the Secretary shows more than simply a logical relation, that

is, whether he shows a *reasonable* relation. We believe the material presented here by the prison officials is sufficient to demonstrate that the Policy is a reasonable one.

*Overton* provides significant support for this conclusion. In *Overton* we upheld a prison's "severe" restriction on the family visitation privileges of prisoners with repeat substance abuse violations. 539 U. S., at 134. Despite the importance of the rights there at issue, we held that withholding such privileges "is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose." *Ibid.*

The Policy and circumstances here are not identical, but we have not found differences that are significant. In both cases, the deprivations at issue (all visits with close family members; all access to newspapers, magazines, and photos) have an important constitutional dimension. In both cases, prison officials have imposed the deprivation at issue only upon those with serious prison-behavior problems (here the 40 most intractable inmates in the Commonwealth). In both cases, prison officials, relying on their professional judgment, reached an experience-based conclusion that the policies help to further legitimate prison objectives.

The upshot is that, if we consider the Secretary's supporting materials, *i.e.*, the statement and deposition), by themselves, they provide sufficient justification for the Policy. That is to say, unless there is more, they bring the Policy within *Turner*'s legitimating scope.

B

Although summary judgment rules provided Banks with an opportunity to respond to the Secretary's materials, he did not offer any fact-based or expert-based refutation in the manner the rules provide. Fed. Rule Civ. Proc. 56(e)

(requiring plaintiff through, *e.g.*, affidavits, etc., to "s*et forth specific facts showing that there is a genuine issue for trial*" (emphasis added)). Instead, Banks filed his own cross-motion for summary judgment in which he claimed that the Policy fell of its own weight, *i.e.*, that the Policy was "unreasonable as a matter of law." Plaintiffs' Brief in Support of Motion for Summary Judgment in C. A. 01–1956 (WD Pa.), p. 13 (hereinafter Plaintiffs' Brief). In particular, Banks argued (and continues to argue) that the Policy lacks any significant incentive effect given the history of incorrigibility of the inmates concerned and the overall deprivations associated with the LTSU, Brief for Respondent 22; Plaintiffs' Brief 13. He points in support to certain court opinions that he believes reflect expert views that favor his position. *Abdul Wali* v. *Coughlin*, 754 F. 2d 1015, 1034 (CA2 1985); *Bieregu* v. *Reno*, 59 F. 3d 1445, 1449 (CA3 1995); *Knecht* v. *Collins*, 903 F. Supp. 1193, 1200 (SD Ohio 1995), aff'd in part, rev'd in part, vacated in part, 187 F. 3d 636 (CA6 1999). And he adds that only about one-quarter of level 2 inmates graduate out of that environment.

The cases to which Banks refers, however, simply point out that, in the view of some courts, increased contact with the world generally favors rehabilitation. See *Abdul Wali*, *supra*, at 1034; *Bieregu*, *supra*, at 1449; *Knecht*, *supra*, at 1200. That circumstance, as written about in court opinions, cannot provide sufficient support, particularly as these courts were not considering contexts such as this one, where prison officials are dealing with especially difficult prisoners. Neither can Banks find the necessary assistance in the fact that only one-quarter or so of the level 2 population graduates to level 1 or out of the LTSU. Given the incorrigibility of level 2 inmates—which petitioner himself admits—there is nothing to indicate that a 25 percent graduation rate is low, rather than, as the Secretary suggests, acceptably high.

We recognize that the Court of Appeals reached a contrary conclusion. But in doing so, it placed too high an evidentiary burden upon the Secretary. In respect to behavior-modification incentives, for example, the court wrote that the "District Court did not examine . . . whether the ban was implemented in a way that could modify behavior, or inquire into whether the [Department of Corrections'] deprivation theory of behavior modification had any basis in real human psychology, or had proven effective with LTSU inmates." 399 F. 3d, at 142. And, the court phrased the relevant conclusions in terms that placed a high summary judgment evidentiary burden upon the Secretary, *i.e.*, the moving party. See, *e.g.*, *id.*, at 141 ("[W]e cannot say that the [defendant] has shown how the regulations in this case serve [an incentive-related] purpose"). The court's statements and conclusions here also offer too little deference to the judgment of prison officials about such matters. The court, for example, offered no apparent deference to the deputy prison superintendent's professional judgment that the Policy deprived "particularly difficult" inmates of a last remaining privilege and that doing so created a significant behavioral incentive.

Contrary to JUSTICE GINSBURG's suggestion, *post*, at 2–4, we do not suggest that the deference owed prison authorities makes it impossible for prisoners or others attacking a prison policy like the present one ever to succeed or to survive summary judgment. After all, the constitutional interest here is an important one. *Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective. A prisoner may be able to marshal substantial evidence that, given the importance of the interest, the Policy is not a reasonable one. Cf. 482 U. S., at 97–99 (striking down prison policy prohibiting prisoner marriages). And with or without the assistance that public interest law

firms or clinics may provide, it is not inconceivable that a plaintiff's counsel, through rigorous questioning of officials by means of depositions, could demonstrate genuine issues of fact for trial. Finally, as in *Overton*, we agree that "the restriction here is severe," and "if faced with evidence that [it were] a *de facto* permanent ban . . . we might well reach a different conclusion in a challenge to a particular application of the regulation." 539 U. S., at 134. That is not, however, the case before us.

Here prison authorities responded adequately through their statement and deposition to the allegations in the complaint. And the plaintiff failed to point to "'specific facts'" in the record that could "lead a rational trier of fact to find" in his favor. *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.,* 475 U. S. 574, 587 (1986) (quoting Fed. Rule Civ. Proc. 56(e)).

The judgment of the Court of Appeals for the Third Circuit is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 04–1739

JEFFREY A. BEARD, SECRETARY, PENNSYLVANIA
DEPARTMENT OF CORRECTIONS, PETITIONER *v.*
RONALD BANKS, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 28, 2006]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins,
concurring in the judgment.

Judicial scrutiny of prison regulations is an endeavor
fraught with peril. Just last Term, this Court invalidated
California's policy of racially segregating prisoners in its
reception centers, notwithstanding that State's warning
that its policy was necessary to prevent prison violence.
See *Johnson* v. *California,* 543 U. S. 499 (2005). California
subsequently experienced several instances of severe race-
based prison violence, including a riot that resulted in 2
fatalities and more than 100 injuries, and significant fight-
ing along racial lines between newly arrived inmates, the
very inmates that were subject to the policy invalidated by
the Court in *Johnson.* See Winton & Bernstein, More Vio-
lence Erupts at Pitchess; Black and Latino inmates clash at
the north county jail, leaving 13 injured, Los Angeles Times,
Mar. 1, 2006, Metro Desk, p. B1. This powerful reminder of
the grave dangers inherent in prison administration con-
firms my view that the framework I set forth in *Overton* v.
*Bazzetta,* 539 U. S. 126, 138 (2003) (opinion concurring in
judgment), is the least perilous approach for resolving chal-
lenges to prison regulations, as well as the approach that is
most faithful to the Constitution. Accordingly, I concur only

in the judgment of the Court.

## I

Both the plurality and the dissent evaluate the regulations challenged in this case pursuant to the approach set forth in *Turner* v. *Safley,* 482 U. S. 78 (1987), which permits prison regulations that "imping[e] on inmates' constitutional rights" if the regulations are "reasonably related to legitimate penological interests." *Id.*, at 89. But as I explained in *Overton*, *Turner* and its progeny "rest on the unstated (and erroneous) presumption that the Constitution contains an implicit definition of incarceration." *Overton*, 539 U. S., at 139 (opinion concurring in judgment). Because the Constitution contains no such definition, "States are free to define and redefine all types of punishment, including imprisonment, to encompass various types of deprivations—*provided only that those deprivations are consistent with the Eighth Amendment*." *Ibid.* (emphasis in original). Respondent has not challenged Pennsylvania's prison policy as a violation of the Eighth Amendment, and thus the sole inquiry in this case is whether respondent's sentence deprived him of the rights he now seeks to exercise. *Id.*, at 140.

"Whether a sentence encompasses the extinction of a constitutional right enjoyed by free persons turns on state law, for it is a State's prerogative to determine how it will punish violations of its law." *Ibid.*[1] Although the question of whether Pennsylvania intended to confer upon respon-

---

[1] As in *Overton*, respondent has not asked this Court to abstain from resolving his constitutional challenge under *Railroad Comm'n of Tex.* v. *Pullman Co.,* 312 U. S. 496 (1941) (holding that federal courts should ordinarily abstain where the resolution of a federal constitutional issue may be rendered irrelevant by the determination of a predicate state-law question), and the issue of *Pullman* abstention was not considered below. As a result, respondent has "submitted to the sort of guesswork about the meaning of prison sentences that is the hallmark of the *Turner* inquiry." *Overton*, 539 U. S., at 141 (THOMAS, J., concurring in judgment).

dent and other inmates a right to have unfettered access to newspapers, magazines, and photographs is thus "ultimately for the State itself to answer," in the absence of a resolution of that question by the Pennsylvania Supreme Court, we must resolve it in the instant case. *Id.*, at 141. Fortunately, the answer is straightforward.

In *Overton*, I explained:

> "[s]entencing a criminal to a term of imprisonment may, under state law, carry with it the implied delegation to prison officials to discipline and otherwise supervise the criminal while he is incarcerated. Thus, restrictions imposed by prison officials may also be a part of the sentence, provided that those officials are not acting ultra vires with respect to the discretion given them, by implication, in the sentence." *Id.*, at 140, n. \*

A term of imprisonment in Pennsylvania includes such an implied delegation. Pennsylvania inmates are subject to the rules and disciplinary measures set forth by the Pennsylvania Department of Corrections. See, *e.g.,* Bulletin Inmate Discipline, Policy No. DC–ADM 801 (2004), http://www.cor.state.pa.us/standards/lib/standards/DC-ADM_801_Inmate_Discipline.pdf (as visited June 12, 2006, and available in Clerk of Court's case file). And no one disputes that the regulations challenged in the instant litigation fall within the discretion given to the Department of Corrections. As in *Overton*, the conclusion that these regulations are included in the prison sentence is strongly supported by the plurality's *Turner* analysis. A prison policy that has a "valid rational connection [to the . . . legitimate penological objectives" of improving prison security and discouraging inmate misbehavior, *ante,* at 8 (internal quotation marks omitted), "that [is] designed to avoid adverse impacts on guards, inmates, or prison resources, [and] that cannot be replaced by 'ready alterna-

tives,' [is] presumptively included within a sentence of imprisonment." *Overton*, 539 U. S., at 141–142 (THOMAS, J., concurring in judgment).

The "history of incarceration as punishment [also] supports the view that the sentenc[e] imposed on responden[t] terminated" his unfettered right to magazines, newspapers, and photographs. *Id.*, at 142. As I explained in *Overton*, imprisonment as punishment "became standardized in the period between 1780 and 1865," *id.*, at 143 (citing McGowen, The Well-Ordered Prison: England, 1780–1865, in The Oxford History of the Prison: The Practice of Punishment in Western Society 79 (N. Morris & D. Rothman eds. 1995)), and was distinguished by the prisoner's isolation from the outside world. 539 U. S., at 143. Indeed, both the Pennsylvania and Auburn prison models, which formed the basis for prison systems throughout the Nation in the early 1800's, imposed this isolation specifically by denying prisoners access to reading materials and contact with their families. Rothman, Perfecting the Prison: United States, 1789–1865, in The Oxford History of the Prison 117; see also *id.,* at 118 (explaining that in the Pennsylvania system, inmates were "given nothing to read except the Bible and were prevented from corresponding with friends and family"); S. Christianson, With Liberty for Some: 500 Years of Imprisonment in America 145 (1998) (explaining that in Sing Sing, the standard bearer for the Auburn model, no reading materials of any kind, except the Bible, were allowed inside). Even as the advent of prison libraries increased prisoners' access to reading materials, that access was universally "subject to some form of censorship," such that "inmates of correctional institutions are denied access to books which are freely available to the rest of the community." G. Bramley, Outreach: Library Services for the Institutionalized, the Elderly, and the Physically Handicapped 91, 93 (1978).

Although Pennsylvania "is free to alter its definition of incarceration to include the retention" of unfettered access to magazines, newspapers, and photographs, it appears that the Commonwealth instead sentenced respondent against the backdrop of its traditional conception of imprisonment, which affords no such privileges. *Overton*, *supra*, at 144–145 (THOMAS, J., concurring in judgment). Accordingly, respondent's challenge to Pennsylvania's prison regulations must fail.

## II

This case reveals the shortcomings of the *Turner* framework, at least insofar as that framework is applied to prison regulations that seek to modify inmate behavior through privilege deprivation. In applying the first *Turner* factor, the plurality correctly observes that Pennsylvania's policy of depriving its most incorrigible inmates of their last few remaining privileges bears a "valid rational connection" to the "legitimate penological objectiv[e]" of "encourag[ing] progress and discourag[ing] backsliding" of inmate compliance with prison rules. *Ante,* at 8, 9 (internal quotation marks omitted). Indeed, this Court has previously determined that "[w]ithdrawing . . . privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners." *Overton, supra*, at 134.[2]

Although policies, such as Pennsylvania's, that seek to promote compliance with prison rules by withdrawing

———————

[2] In my view, this legal conclusion, combined with the deference to the judgment of prison officials required under *Turner*, see *ante,* at 8–15, would entitle prison officials to summary judgment against challenges to their inmate prison deprivation policies in virtually every case. In this context, it is highly unlikely a prisoner could establish that the "connection between the regulation and the asserted goal is arbitrary or irrational." *Shaw* v. *Murphy*, 532 U. S. 223, 229 (2001) (internal quotation marks omitted).

various privileges may always satisfy *Turner*'s first factor, they necessarily fail its second factor. Such policies, by design, do not provide an "alternative means" for inmates to exercise the rights they have been deprived. 482 U. S., at 90. The "legitimate penological objectiv[e]" of encouraging compliance with prison rules by depriving misbehaving inmates of various privileges simply cannot be accomplished if prison officials are required to provide prisoners with an alternative and equivalent set of privileges. Thus, the plurality's observation that respondent's privileges may be restored in response to continued, improved behavior, is simply irrelevant to the second factor of *Turner*, which asks only "whether . . . alternative means of exercising the right . . . remain open to prison inmates." *Ibid.* The answer in the context of privilege deprivation policies is always no, thus demonstrating the difficulty of analyzing such policies under the *Turner* framework.

The third and fourth *Turner* factors are likewise poorly suited to determining the validity of inmate privilege deprivation policies. When the "valid penological objectiv[e]" of a prison policy is encouraging compliance with prison rules, it makes little sense to inquire into "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," or into the availability of "ready alternatives." *Ibid.* At best, such inquiries merely collapse the third and fourth factors into the first, because accommodating the exercise of the deprived right will undermine the incentive effects of the prison policy and because the unavailability of "ready alternatives" is typically (as in this case) one of the underlying rationales for the adoption of inmate privilege deprivation policies.

\*    \*    \*

Because the prison regulations at issue today are permissible under the approach I explained in *Overton*, I concur in the judgment of the Court.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–1739

———————

## JEFFREY A. BEARD, SECRETARY, PENNSYLVANIA DEPARTMENT OF CORRECTIONS, PETITIONER *v.* RONALD BANKS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 28, 2006]

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

By ratifying the Fourteenth Amendment, our society has made an unmistakable commitment to apply the rule of law in an evenhanded manner to all persons, even those who flagrantly violate their social and legal obligations. Thus, it is well settled that even the "'worst of the worst'" prisoners retain constitutional protection, specifically including their First Amendment rights. See*, e.g.*, *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 348 (1987). When a prison regulation impinges upon First Amendment freedoms, it is invalid unless "it is reasonably related to legitimate penological interests." *Turner* v. *Safley,* 482 U. S. 78, 89 (1987). Under this standard, a prison regulation cannot withstand constitutional scrutiny if "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational," *id.*, at 89–90, or if the regulation represents an "exaggerated response" to legitimate penological objectives, *id.*, at 98.

In this case, Pennsylvania prison officials have promulgated a rule that prohibits inmates in Long Term Segregation Unit, level 2 (LTSU–2), which is the most restrictive condition of confinement statewide, from possessing any

secular, nonlegal newspaper, newsletter, or magazine during the indefinite duration of their solitary confinement. A prisoner in LTSU–2 may not even receive an individual article clipped from such a news publication unless the article relates to him or his family. In addition, under the challenged rule, *any* personal photograph, including those of spouses, children, deceased parents, or inspirational mentors, will be treated as contraband and confiscated. See App. 176.

It is indisputable that this prohibition on the possession of newspapers and photographs infringes upon respondent's First Amendment rights. "[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or print, but the right to distribute, the right to receive, the right to read and freedom of inquiry, freedom of thought . . . ." *Griswold* v. *Connecticut,* 381 U. S. 479, 482 (1965) (citation omitted). See also *Kaplan* v. *California,* 413 U. S. 115, 119–120 (1973) (explaining that photographs, like printed materials, are protected by the First Amendment). Plainly, the rule at issue in this case strikes at the core of the First Amendment rights to receive, to read, and to think.

Petitioner does not dispute that the prohibition at issue infringes upon rights protected by the First Amendment. Instead, petitioner posits two penological interests, which, in his view, are sufficient to justify the challenged rule notwithstanding these constitutional infringements: prison security and inmate rehabilitation. Although these interests are certainly valid, petitioner has failed to establish, as a matter of law, that the challenged rule is reasonably related to these interests. Accordingly, the Court of Appeals properly denied petitioner's motion for summary judgment, and this Court errs by intervening to prevent a trial.

Turning first to the security rationale, which the plurality does not discuss, the Court of Appeals persuasively explained why, in light of the amount of materials LTSU-2 inmates may possess in their cells, petitioner has failed to demonstrate that the prohibition on newspapers, magazines, and photographs is likely to have any marginal effect on security.

> "[E]ach [LTSU–2] inmate is given a jumpsuit, a blanket, two bedsheets, a pillow case, a roll of toilet paper, a copy of a prison handbook, ten sheets of writing paper, several envelopes, carbon paper, three pairs of socks, three undershorts and three undershirts, and may at any point also have religious newspapers, legal periodicals, a prison library book, Bibles, and a lunch tray with a plate and a cup. Many of these items are flammable, could be used [to start fires, catapult feces, or to create other dangers] as effectively as a newspaper, magazine or photograph, and have been so used by [LTSU–2] inmates." 399 F. 3d 134, 143 (2005) (case below).

In fact, the amount of potentially dangerous material to which LTSU-2 inmates are seeking access is quite small in comparison to the amount of material that they already possess in their cells. As the Court of Appeals emphasized, LTSU-2 inmates "are not requesting unlimited access to innumerable periodicals," rather, they are seeking "the ability to have *one* newspaper or magazine and some small number of photographs in their cells at one time." 399 F. 3d, at 144 (emphasis added). In light of the quantity of materials that LTSU–2 inmates are entitled to have in their cell, it does not follow, as a matter of logic, that preventing inmates from possessing a single copy of a secular, nonlegal newspaper, newsletter, or magazine will have any measurable effect on the likelihood that inmates will start fires, hide contraband, or engage in other dan-

gerous actions. See, *e.g.*, *Mann* v. *Smith*, 796 F. 2d 79, 81 (CA5 1986) (Higginbotham, J.) (invalidating a county jail's ban on newspapers and magazines because, "[i]n view of the jail's policy of allowing inmates to possess other material that was flammable and capable of being used to interfere with the plumbing," the rule was "too underinclusive" to be constitutional).[1]

Moreover, there is no record evidence in this case to support a contrary conclusion. Deputy Superintendent Joel Dickson, whose deposition is a major part of the sparse record before us, did not identify any dangerous behavior that would be more likely to occur if LTSU-2 inmates obtained the limited access to periodicals that they are seeking. He did, however, make clear that inmates could engage in any of the behaviors that worried prison officials without using banned materials:

> "Q. Wouldn't it be fair to say that if an inmate wants to start a fire, he could start a fire using writing paper in combination with a blanket or in combination with clothing or linen, bedding materials? He could do that; couldn't he?
>
> "A. Yes.
>
> "Q. If he wants to throw feces, he could use a cup for that; true?
>
> "A. Yes.
>
> "Q. Or if he wants to throw urine, he can use his cup to throw the urine?

---

[1] Even less apparent is the security risk that would be posed by respondent's alternative suggestion, which is that LTSU-2 inmates be able to access news periodicals in the LTSU mini-law library, where inmates are already permitted to go to view legal materials during 2-hour blocs of time pursuant to a first-come, first-serve roster of requests. See 399 F. 3d 134, 147 (2005) (case below).

"A. Yes." App. 196–197.[2]

The security-based justification for the ban on personal photographs is even weaker. There is not a single statement in Superintendent Dickson's deposition suggesting that prisoners have used, or would be likely to use, photographic paper to start fires or hurl excrement. Cf. *id.,* at 196 (stating that paper products are generally used to start fires).

Perhaps, at trial, petitioner could introduce additional evidence supporting his view that the challenged regulation is in fact reasonably likely to enhance security or that respondent's request for limited access to newspapers and photographs would, for some as yet undisclosed reason, require an unduly burdensome expenditure of resources on the part of prison officials. However, the above discussion makes clear that, at the very least, "reasonable minds could differ as to the import of the evidence" introduced thus far concerning the relationship between the challenged regulation and petitioner's posited security interest, *Anderson* v. *Liberty Lobby, Inc.,* 477 U. S. 242, 250 (1986). Accordingly, petitioner's valid interest in security is not sufficient to warrant judgment as a matter of law. See *id.*, at 250–251.

The second rationale posited by petitioner in support of the prohibitions on newspapers, newsletters, magazines, and photographs is rehabilitation. According to petitioner, the ban "provides the [l]evel 2 inmates with the prospect of earning a privilege through compliance with orders and remission of various negative behaviors and serves to encourage the progress and discourage backsliding by the

_____

[2] See also App. 194 ("I would say there's any number of ways [LTSU–2 inmates hurl feces]. Oftentimes it's with the cups that they're given for their drinks, things like that, any type of container; or . . . a piece of paper or whatever wrapped up that they can use to give a little leverage and fling the materials.").

level 1 inmates." App. 27. In the plurality's view, in light
of the present record, this rationale is sufficient to warrant
a reversal of the judgment below.

Rehabilitation is undoubtedly a legitimate penological
interest. However, the particular theory of rehabilitation
at issue in this case presents a special set of concerns for
courts considering whether a prison regulation is consis-
tent with the First Amendment. Specifically, petitioner
advances a deprivation theory of rehabilitation: Any dep-
rivation of something a prisoner desires gives him an
added incentive to improve his behavior. This justification
has no limiting principle; if sufficient, it would provide a
"rational basis" for any regulation that deprives a prisoner
of a constitutional right so long as there is at least a theo-
retical possibility that the prisoner can regain the right at
some future time by modifying his behavior. See *Kimber-
lin* v. *United States Dept. of Justice*, 318 F. 3d 228, 240
(CADC 2003) *(per curiam)* (Tatel, J., concurring in part
and dissenting in part) (noting that "regulations that
deprive prisoners of their constitutional rights will *always*
be rationally related to the goal of making prison more
miserable"). Indeed, the more important the constitu-
tional right at stake (at least from the prisoners' perspec-
tive), the stronger the justification for depriving prisoners
of that right. The plurality admits as much: "If the policy
(in the authorities' view) helps to produce better behavior,
then its absence (in the authorities' view) will help to
produce worse behavior. . . ." *Ante*, at 9.

Not surprisingly, as JUSTICE THOMAS recognizes, see
*ante*, at 5-6, this deprivation theory does not map easily
onto several of the *Turner* factors, which are premised on
prison officials presenting a secondary effects type ration-
ale in support of a challenged regulation. For instance,
under the deprivation theory of rehabilitation, there could
never be a "ready alternative" for furthering the govern-
ment interest, because the government interest is tied

directly to depriving the prisoner of the constitutional right at issue.

Indeed, the strong form of the deprivation theory of rehabilitation would mean that the prison rule we invalidated in *Turner* would have survived constitutional scrutiny if the State had simply posited an interest in rehabilitating prisoners through deprivation. In *Turner*, we held that a Missouri regulation that forbade inmates from marrying except with the permission of the prison superintendent was facially unconstitutional. See 482 U. S., at 97–99. We rejected the State's proffered security and rehabilitation concerns as not reasonably related to the marriage ban. See *ibid.* Taken to its logical conclusion, however, the deprivation theory of rehabilitation would mean that the marriage ban in *Turner* could be justified because the prohibition furnished prisoners with an incentive to behave well and thus earn early release. Cf. *Safley* v. *Turner*, 586 F. Supp. 589, 593 (WD Mo. 1984) (noting that, under the Missouri regulations partially invalidated by *Turner*, 482 U. S. 78, inmates had been threatened with the loss of parole for attempting to exercise their marriage rights).

In sum, rehabilitation is a valid penological interest, and deprivation is undoubtedly one valid tool in promoting rehabilitation. Nonetheless, to ensure that *Turner* continues to impose meaningful limits on the promulgation of rules that infringe upon inmates' constitutional rights, see *Thornburgh* v. *Abbott,* 490 U. S. 401, 414 (1989) (stating that *Turner*'s reasonableness standard "is not toothless"), courts must be especially cautious in evaluating the constitutionality of prison regulations that are supposedly justified primarily on that basis. When, as here, a reasonable factfinder could conclude that challenged deprivations have a tenuous logical connection to rehabilitation, or are exaggerated responses to a prison's legitimate interest in rehabilitation, prison officials are not entitled to judgment

as a matter of law.

Petitioner argues that, because the various deprivations in the levels of disciplinary confinement short of LTSU–2 are also severe, prison officials have no choice but to deprive inmates of core constitutional rights in LTSU–2 in order to make LTSU–2 more unattractive than other types of segregation. The fact that most States and the Federal Government run their prisons without resorting to the type of ban at issue in this case, see Brief for American Civil Liberties Union et al. as *Amici Curiae* 21,[3] casts serious doubt upon the need for the challenged constitutional deprivations.

In any event, if we consider the severity of the other conditions of confinement in LTSU–2, it becomes obvious that inmates have a powerful motivation to escape those conditions irrespective of the ban on newspapers, magazines, and personal photographs. Inmates in LTSU–2 face 23 hours a day in solitary confinement, are allowed only one visitor per month, may not make phone calls except in cases of emergency, lack any access to radio or television, may not use the prison commissary, are not permitted General Educational Development (GED) or special education study, and may not receive compensation under the inmate compensation system if they work as a unit janitor. Although conditions in LTSU–1 are also harsh, in several respects unrelated to the challenged regulation, they are far more appealing than the conditions in LTSU–2. LTSU–1 inmates may have two visitors and may make one phone call per month; they have access to the commis-

_____

[3] This is presumably the type of evidence the plurality suggests that respondent should have presented through an affidavit or deposition in response to petitioner's motion for summary judgment. See *Jacklovich* v. *Simmons*, 392 F. 3d 420, 428–429 (CA10 2004) (noting that plaintiffs challenging a prison regulation that limited access to publications had introduced such evidence and concluding that prison officials were not entitled to summary judgment).

sary; they are permitted in-cell GED or special education study; they are permitted a wider range of counseling services; and they are eligible to obtain compensation under the inmate compensation system. See App. 43, 102; 399 F. 3d, at 148 (case below). The logical conclusion from this is that, even if LTSU–2 prisoners were not deprived of access to newspapers and personal photographs, they would still have a strong incentive to gain promotion to LTSU–1.

In addition, prisoners in LTSU–1 do *not* regain access to personal photographs, which means that the ban on photographs cannot be justified by petitioner's "'hope'" that inmates will respond to the constitutional deprivations in LTSU–2 by improving their behavior so they may graduate into LTSU–1, 399 F. 3d, at 142 (quoting petitioner's counsel). Prisoners who "graduate" out of the LTSU–1 and back into the general prison population do regain their right to possess personal photographs, but they also regain so many additional privileges—from ending their solitary confinement to regaining access to television and radio—that it strains credulity to believe that that the possibility of regaining the right to possess personal photographs if they eventually return to the general prison population would have any marginal effect on the actions of prisoners in LTSU–2.

In sum, the logical connection between the ban on newspapers and (especially) the ban on personal photographs, on one hand, and the rehabilitation interests posited by petitioner, on the other, is at best highly questionable. Moreover, petitioner did not introduce evidence that his proposed theory of behavior modification has any basis in human psychology, or that the challenged rule has in fact had any rehabilitative effect on LTSU–2 inmates. *Ibid.*[4]

––––––––––

[4] I emphasize the lack of evidentiary support for petitioner's position because I believe that, in light of the record currently before the Court,

Accordingly, at least based on the present state of the record, a reasonable factfinder could conclude that prisoners would have a sufficiently powerful incentive to graduate out of LTSU–2 even absent the challenged rule, such that the rule is not likely to have any appreciable behavior modification effect.

The temporal character of LTSU–2 status further undermines petitioner's argument that the ban on newspapers and photographs at issue in this case is reasonably related to a legitimate penological interest. All LTSU inmates must spend 90 days in LTSU–2 status. After that, they receive a review every 30 days to determine if they should be promoted to LTSU–1. That determination is made at the discretion of prison administrators, and is not linked to any specific infraction or compliance. Petitioner acknowledges that "[a]n inmate in the LTSU can remain on Level 2 status indefinitely." App. 26. Indeed, as of August 2002, which is the most recent date for which there is record evidence, roughly three-quarters of inmates placed in LTSU–2 had remained in that status since the inception of the LTSU program over two years earlier. See *id.,* at 138. See also *ante,* at 9 (plurality opinion). In short, as the Court of Appeals explained:

> "[T]he LTSU Level 2 is a unique kind of segregation with characteristics of both disciplinary and administrative segregation. Inmates come to LTSU because of 'unacceptable behaviors' in other institutions, but

---

the logical connection between petitioner's stated interest in rehabilitation and the prohibition on newspapers and photographs is exceedingly tenuous. When the logical connection between prison officials' stated interests and the restrictions on prisoners' constitutional rights is not self-evident, we have considered whether prison officials proffered any evidence that their regulations served the values they identified. See, *e.g.*, *Turner* v. *Safley,* 482 U. S. 78, 98 (1987) (discussing lack of evidence in the record to support a ban on marriage as related to prison officials' stated objectives).

they have not all been adjudicated by a hearing officer to have violated the [Department of Corrections'] rules. The LTSU is not a place where inmates are sent for a discrete period of punishment, pursuant to a specific infraction, but is a place for 'Long Term' segregation of the most incorrigible and difficult prisoners for as long as they fall under that umbrella." 399 F. 3d, at 141 (citation omitted).

The indefinite nature of LTSU–2 confinement, and the fact that as of August 2002 a significant majority of inmates confined at LTSU–2 had remained there since the inception of the program over two years earlier, suggest that the prohibition on newspapers, magazines, and personal photographs is an exaggerated response to the prison's legitimate interest in rehabilitation. It would be a different case if prison officials had promulgated a regulation that deprived LTSU-2 inmates of certain First Amendment rights for a short period of time in response to specific disciplinary infractions. The indefinite deprivations at issue here, however, obviously impose a much greater burden on inmates' ability to exercise their constitutional rights. Absent evidence that these indefinite deprivations will be more effective in achieving rehabilitation than shorter periods of deprivation, a reasonable factfinder could conclude that the challenged regulation "sweeps much more broadly than can be explained by [prison officials'] penological objectives," *Turner*, 482 U. S., at 98, and is hence an exaggerated response to petitioner's legitimate interest in rehabilitation.

In short, as with regard to the current state of the record concerning the connection between the challenged regulation and its effect on prison security, the record is insufficient to conclude, as a matter of law, that petitioner has established a reasonable relationship between his valid interest in inmate rehabilitation and the prohibition

on newspapers, magazines, and personal photographs in
LTSU–2.

*        *        *

What is perhaps most troubling about the prison regula-
tion at issue in this case is that the rule comes perilously
close to a state-sponsored effort at mind control.   The
State may not " 'invad[e] the sphere of intellect and spirit
which it is the purpose of the First Amendment of our
Constitution to reserve from all official control.' " *Wooley*
v. *Maynard,* 430 U. S. 705, 715 (1977) (quoting *West Vir-
ginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 642 (1943)).   In
this case, the complete prohibition on secular, nonlegal
newspapers, newsletters, and magazines prevents prison-
ers from "receiv[ing] suitable access to social, political,
esthetic, moral, and other ideas," which are central to the
development and preservation of individual identity, and
are clearly protected by the First Amendment, *Red Lion
Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969).   Simi-
larly, the ban on personal photographs, for at least some
inmates, interferes with the capacity to remember loved
ones, which is undoubtedly a core part of a person's "sphere
of intellect and spirit."   Moreover, it is difficult to imagine a
context in which these First Amendment infringements
could be more severe; LTSU-2 inmates are in solitary con-
finement for 23 hours a day with no access to radio or televi-
sion, are not permitted to make phone calls except in cases
of emergency, and may only have one visitor per month.
They are essentially isolated from any meaningful contact
with the outside world.   The severity of the constitutional
deprivations at issue in this case should give us serious
pause before concluding, as a matter of law, that the chal-
lenged regulation is consistent with the sovereign's duty to
treat prisoners in accordance with "the ethical tradition
that accords respect to the dignity and worth of every
individual."   *Overton* v. *Bazzetta,* 539 U. S. 126, 138 (2003)

(STEVENS, J., joined by SOUTER, GINSBURG, and BREYER, JJ., concurring) (citation and internal quotation marks omitted).[5]

Because I believe a full trial is necessary before forming a definitive judgment on the whether the challenged regulation is reasonably related to petitioner's valid interests in security and rehabilitation, I respectfully dissent.

---

[5] In contrast to this case, the constitutional right at issue in *Overton* involved freedom of association, which, "as our cases have established . . . is among the rights least compatible with incarceration." *Overton* v. *Bazzetta,* 539 U. S. 126, 131 (2003).

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–1739

———————

JEFFREY A. BEARD, SECRETARY, PENNSYLVANIA
DEPARTMENT OF CORRECTIONS, PETITIONER *v.*
RONALD BANKS, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 28, 2006]

JUSTICE GINSBURG, dissenting.

JUSTICE STEVENS comprehensively explains why the justifications advanced by the Secretary of Pennsylvania's Department of Corrections (Secretary) do not warrant pretrial dismissal of Ronald Banks's complaint alleging arbitrary deprivation of access to the news of the day. *Ante*, p. 1. Joining JUSTICE STEVENS' dissenting opinion in full, I direct this separate writing to the plurality's apparent misapprehension of the office of summary judgment.

As the plurality recognizes, *ante*, at 6, there is more to the summary judgment standard than the absence of any genuine issue of material fact; the moving party must also show that he is "entitled to a judgment as a matter of law." Fed. Rule Civ. Proc. 56(c); *Anderson* v. *Liberty Lobby, Inc.,* 477 U. S. 242, 249–255 (1986); *id.,* at 250–251 (summary judgment is unwarranted "[i]f reasonable minds could differ as to the import of the evidence"). Here, the Secretary cannot instantly prevail if, based on the facts so far shown and with due deference to the judgment of prison authorities, a rational trier could conclude that the challenged regulation is not "reasonably related to legitimate penological interests." *Turner* v. *Safley,* 482 U. S. 78, 89

(1987).

The showing made by the Secretary in support of summary judgment is slim, the kind that could be made to justify virtually any prison regulation that does not involve physical abuse. The Secretary relies on his own statement of undisputed facts and the deposition of the prison's Deputy Superintendent. The deposition states that "obviously we are attempting to do the best we can to modify the inmate's behavior so that eventually he can become a more productive citizen . . . . We're very limited . . . in what we can and cannot deny or give to an inmate, and [newspapers and photographs] are some of the items that we feel are legitimate as incentives for inmate growth." App. 189, 190. The Secretary's statement of undisputed facts similarly asserts that the regulation "serves to encourage . . . progress and discourage backsliding." *Id.,* at 27.

These statements, the plurality holds, are sufficient to show that the challenged regulation is reasonably related to inmate rehabilitation. *Ante*, at 8. But prison officials "'cannot avoid court scrutiny by reflexive, rote assertions.'" *Shimer* v. *Washington*, 100 F. 3d 506, 510 (CA7 1996) (quoting *Williams* v. *Lane*, 851 F. 2d 867, 886 (CA7 1988) (Flaum, J., concurring in result)). See also *Turner*, 482 U. S., at 98 (noting lack of evidence offered by prison officials to support a ban on inmate marriages); *Murphy* v. *Missouri Dept. of Corrections*, 372 F. 3d 979, 986 (CA8 2004) (applying *Turner* and concluding that the Corrections Department's "documented reason for censoring [a magazine] is too conclusory to support [summary] judgment in its favor"); *Jacklovich* v. *Simmons*, 392 F. 3d 420, 428–434 (CA10 2004). "'[T]raditional deference does not mean that courts [are to] abdicat[e] their duty to protect those constitutional rights that a prisoner retains.'" 399 F. 3d 134, 140 (CA3 2005) (quoting *Fortner* v. *Thomas*, 983 F. 2d 1024, 1029 (CA11 1993)).

The plurality correctly recognizes that it "must draw 'all justifiable inferences' in Banks'[s] 'favor.'" *Ante*, at 6 (quoting *Liberty Lobby,* 477 U. S., at 255). It then backtracks, distinguishing "evidence of disputed facts" from "disputed matters of professional judgment," and asserts that "[i]n respect to the latter, our inferences must accord deference to the views of prison authorities." *Ante*, at 6. While *Turner* deference can and should be incorporated into the evaluation of a motion for summary judgment, that deference should come into play, pretrial, only after the facts shown are viewed in the light most favorable to the nonmoving party and all inferences are drawn in that party's favor. See *Liberty Lobby,* 477 U. S., at 252–255; cf. *Reeves* v. *Sanderson Plumbing Products, Inc.,* 530 U. S. 133, 150–151 (2000).

As I see it, on the limited record thus far made and without the benefit of trial, "the logical connection between the [no news journals] regulation and the asserted goal" could be found by a reasonable trier to be "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U. S., at 89–90. The regulation denies The Christian Science Monitor to inmates housed in level 2 of the prison's long-term segregation unit but allows them The Jewish Daily Forward, based on the determination of a prison official that the latter qualifies as a religious publication and the former does not. App. 179–180; 399 F. 3d, at 147. Prisoners are allowed to read Harlequin romance novels, but not to learn about the war in Iraq or Hurricane Katrina. The first justification cited by prison officials for impinging on inmates' First Amendment rights in this way is too tenuous to be plausible. See *ante*, at 3–5 (STEVENS, J., dissenting) (discussing security rationale); 399 F. 3d, at 142–144 (same). The second could be recited, routinely, to immunize all manner of prison regulations from review for rationality. See *ante*, at 5–12 (STEVENS, J., dissenting) (discussing deprivation/"rehabilitation"

rationale); 399 F. 3d, at 140–142 (same).

*Turner* came to us after a full trial, and the Court's opinion in that case relied heavily on testimony elicited at trial in evaluating the reasonableness of the regulations at issue. 482 U. S., at 91–93, 96–99. *Overton* likewise came to this Court on a record made at trial. *Overton* v. *Bazzetta,* 539 U. S. 126, 133 (2003). But in this case, the defender of the regulation invites summary judgment. All inferences are to be drawn in favor of the prisoner opposing the regulation, and the question is not which side has the better argument, but whether the Secretary has shown he is entitled to a judgment *as a matter of law*. By elevating the summary judgment opponent's burden to a height prisoners lacking nimble counsel cannot reach, the plurality effectively tells prison officials they will succeed in cases of this order, and swiftly, while barely trying. It suffices for them to say, in our professional judgment the restriction is warranted. The asserted right to read, see *ante*, at 1–2 (STEVENS, J., dissenting), is indeed an "important one," see *ante*, at 12 (plurality opinion of BREYER, J.). Even in highest security custody, a constitutional interest of that order merits more than peremptory treatment.

\*　　\*　　\*

For the reasons stated by JUSTICE STEVENS and in this opinion, I would affirm the Third Circuit's judgment reversing the award of summary judgment to the Secretary.