# SUPREME COURT OF THE UNITED STATES

## WILLIAM LEE THOMPSON *v.* WALTER A. MCNEIL, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 08–7369.   Decided March 9, 2009

JUSTICE THOMAS, concurring in denial of certiorari.

I remain "unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed." *Knight* v. *Florida*, 528 U. S. 990 (1999) (THOMAS, J., concurring in denial of certiorari). Petitioner William Lee Thompson has pleaded guilty to this murder—twice. *Thompson* v. *State*, 759 So. 2d 650, 654 (Fla. 2000) *(per curiam)*. Having confessed, petitioner could have accepted "what the people of Florida have deemed him to deserve: execution." *Foster* v. *Florida*, 537 U. S. 990, 991 (2002) (THOMAS, J., concurring in denial of certiorari). But because petitioner chose to challenge his death sentence, JUSTICE STEVENS and JUSTICE BREYER suggest that the subsequent delay caused by petitioner's 32 years of litigation creates an Eighth Amendment problem. *Ante*, at 2–4 (STEVENS, J., statement respecting denial of certiorari); *post*, at 1–3 (BREYER, J., dissenting from denial of certiorari). I disagree. It makes "a mockery of our system of justice . . . for a convicted murderer, who, through his own interminable efforts of delay . . . has secured the almost-indefinite postponement of his sentence, to then claim that the almost-indefinite postponement renders his sentence unconstitutional." *Turner* v. *Jabe*, 58 F. 3d 924, 933 (CA4 1995) (Luttig, J., concurring in judgment).

JUSTICE BREYER replies that a death-row inmate's Eighth Amendment challenge to "a delay of more than 30 years" between sentencing and execution should not be "automatically waive[d]" because he chooses to exercise his appellate rights. See *post*, at 1. But framing the issue in this way obscures the central question. The issue is not whether a death-row inmate's appeals "waive" any Eighth Amendment right; the issue instead is whether the death-row inmate's litigation strategy, which delays his execution, provides a justification for the Court to invent a new Eighth Amendment right. It does not. See *Knight*, *supra*, at 992 (opinion of THOMAS, J.) ("Consistency would seem to demand that those who accept our death penalty jurisprudence as a given also accept the lengthy delay between sentencing and execution as a necessary consequence. . . . It is incongruous to arm capital defendants with an arsenal of 'constitutional' claims with which they may delay their executions, and simultaneously to complain when executions are inevitably delayed").

I also disagree with JUSTICE STEVENS that other aspects of the criminal justice system in this country require the fresh examination of the costs and benefits of retaining the death penalty that he seeks. *Ante*, at 2–3. For example, JUSTICE STEVENS criticizes the "dehumanizing effects" of the manner in which petitioner has been confined, *ante,* at 2, but he never pauses to consider whether there is a legitimate penological reason for keeping certain inmates in restrictive confinement. See, *e.g.*, Kocieniewski, Death Row Inmate Said to Beat and Kick Another to Death in New Jersey Prison, New York Times, Sept. 8, 1999, p. B5. Indeed, the disastrous consequences of this Court's recent foray into prison management, *Johnson* v. *California*, 543 U. S. 499 (2005), should have suppressed any urge to second-guess these difficult institutional decisions, *Beard* v. *Banks*, 548 U. S. 521, 536–537 (2006) (THOMAS, J., concurring in judgment) (noting that after the Court in-

validated California's policy of racially segregating prisoners in its reception centers, the State "subsequently experienced several instances of severe race-based prison violence, including a riot that resulted in 2 fatalities and more than 100 injuries, and significant fighting along racial lines between newly arrived inmates, the very inmates that were subject to the policy invalidated by the Court in *Johnson*").

JUSTICE STEVENS also points to the 129 death row inmates that have been "exonerated" since 1973. *Ante*, at 3. These inmates may have been freed from prison, but that does not necessarily mean that they were declared innocent of the crime for which they were convicted. *Kansas* v. *Marsh*, 548 U. S. 163, 180, and n. 7 (2006). Many were merely the beneficiaries of "this Court's Byzantine death penalty jurisprudence." *Knight, supra*, at 991 (opinion of THOMAS, J.). Moreover, by citing these statistics, JUSTICE STEVENS implies "that the death penalty can only be just in a system that does not permit error." *Marsh*, 548 U. S*.,* at 181. But no criminal justice system operates without error. There is no constitutional basis for prohibiting Florida "from authorizing the death penalty, even in our imperfect system." *Ibid.*

Finally, JUSTICE STEVENS altogether refuses to take into consideration the gruesome nature of the crimes that legitimately lead States to authorize the death penalty and juries to impose it. The facts of this case illustrate the point. On March 30, 1976, petitioner and his codefendant were in a motel room with the victim and another woman. They instructed the women to contact their families to obtain money. The victim made the mistake of promising that she could obtain $200 to $300; she was able to secure only $25. Enraged, petitioner's codefendant ordered her into the bedroom, removed his chain belt, forced her to undress, and began hitting her in the face while petitioner beat her with the belt. They then rammed a chair leg into

her vagina, tearing its inner wall and causing internal bleeding; they repeated the process with a nightstick. Petitioner and his codefendant then tortured her with lit cigarettes and lighters and forced her to eat her sanitary napkin and to lick spilt beer off the floor. All the while, they continued to beat her with the chain belt, the club, and the chair leg. They stopped the attack once to force the victim to again call her mother to ask for money. After the call, petitioner and his codefendant resumed the torture until the victim died. *Thompson*, 759 So. 2d, at 653–654.*

Three juries recommended that petitioner receive the death penalty for this heinous murder, and petitioner has received judicial review of his sentence on at least 17 occasions. The decision to sentence petitioner to death is not "'the product of habit and inattention rather than an acceptable deliberative process.'" *Ante*, at 4 (quoting and citing *Baze* v. *Rees,* 553 U. S. ___, ___ (2008) (slip op., at 8, 17) (STEVENS, J., concurring in judgment)). It represents the considered judgment of the people of Florida that a death sentence, which is expressly contemplated by the Constitution, see Amdts. 5, 14, is warranted in this case. It is the crime—and not the punishment imposed by the jury or the delay in petitioner's execution—that was "unacceptably cruel." *Ante*, at 4.

———————

*JUSTICE BREYER suggests that petitioner "may be significantly less culpable than his codefendant, who did not receive the death penalty" principally because Barbara Garritz, the woman who witnessed the murder, averred at petitioner's third sentencing that he was dominated by his codefendant. *Post*, at 2. JUSTICE BREYER ignores, however, that petitioner "testified [at his codefendant's retrial] and took credit for the entire incident" and that Ms. Garritz had previously testified that petitioner "left the bedroom and told" her that he "was so angry he 'felt like killing Sally [the victim].'" *Thompson* v. *State*, 389 So. 2d 197, 199–200 (Fla. 1980) *(per curiam)*. In any event, JUSTICE BREYER's factual recitation is entirely beside the point: He concedes that the jury's decision to sentence petitioner to death was "[r]easonable." *Post*, at 3.