Justice Thomas,
concurring in the judgment in part and dissenting in part.
I agree with the Court that the judgment against the school officials with respect to qualified immunity should be reversed. See ante, at 377-379. Unlike the majority, however, I would hold that the search of Savana Redding did not violate the Fourth Amendment. The majority imposes a vague and amorphous standard on school administrators. It also grants judges sweeping authority to second-guess the measures that these officials take to maintain discipline in *383 their schools and ensure the health and safety of the students in their charge. This deep intrusion into the administration of public schools exemplifies why the Court should return to the common-law doctrine of in loco parentis under which “the judiciary was reluctant to interfere in the routine business of school administration, allowing schools and teachers to set and enforce rules and to maintain order.” Morse v. Frederick, 551 U. S. 393, 414 (2007) (Thomas, J., concurring). But even under the prevailing Fourth Amendment test established by New Jersey v. T. L. O., 469 U. S. 325 (1985), all petitioners, including the school district, are entitled to judgment as a matter of law in their favor.
I
“Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place.” Id., at 337. Thus, although public school students retain Fourth Amendment rights under this Court’s precedent, see id., at 333-337, those rights “are different . . . than elsewhere; the ‘reasonableness’ inquiry cannot disregard the schools’ custodial and tutelary responsibility for children,” Vernonia School Disk 47J v. Acton, 515 U. S. 646, 656 (1995); see also T. L. O., 469 U. S., at 339 (identifying “the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds”). For nearly 25 years this Court has understood that “Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems.” Ibid. In schools, “[e]vents calling for discipline are frequent occurrences and sometimes require immediate, effective action.” Goss v. Lopez, 419 U. S. 565, 580 (1975); see also T. L. O., 469 U. S., at 340 (explaining that schools have a “legitimate need *384 to maintain an environment in which learning can take place”).
For this reason, school officials retain broad authority to protect students and preserve “order and a proper educational environment” under the Fourth Amendment. Id., at 339. This authority requires that school officials be able to engage in the “close supervision of schoolchildren, as well as . . . enforc[e] rules against conduct that would be perfectly permissible if undertaken by an adult.” Ibid. Seeking to reconcile the Fourth Amendment with this unique public school setting, the Court in T. L. O. held that a school search is “reasonable” if it is “ ‘justified at its inception’ ” and “ ‘reasonably related in scope to the circumstances which justified the interference in the first place.’ ” Id., at 341-342 (quoting Terry v. Ohio, 392 U. S. 1, 20 (1968)). The search under review easily meets this standard.
A
A “search of a student by a teacher or other school official will be ‘justified at its inception’ when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school.” T. L. O., supra, at 341-342 (footnote omitted). As the majority rightly concedes, this search was justified at its inception because there were reasonable grounds to suspect that Redding possessed medication that violated school rules. See ante, at 373. A finding of reasonable suspicion “does not deal with hard certainties, but with probabilities.” United States v. Cortez, 449 U. S. 411, 418 (1981); see also T. L. O., supra, at 346 (“[T]he requirement of reasonable suspicion is not a requirement of absolute certainty”). To satisfy this standard, more than a mere “hunch” of wrongdoing is required, but “considerably” less suspicion is needed than would be required to “satisf[y] a preponderance of the evidence standard.” United States v. *385 Arvizu, 534 U. S. 266, 274 (2002) (internal quotation marks omitted).
Furthermore, in evaluating whether there is a reasonable “particularized and objective” basis for conducting a search based on suspected wrongdoing, government officials must consider the “totality of the circumstances.” Id., at 273 (internal quotation marks omitted). School officials have a specialized understanding of the school environment, the habits of the students, and the concerns of the community, which enables them to “ ‘formulat[e] certain common-sense conclusions about human behavior.’” United States v. Sokolow, 490 U. S. 1, 8 (1989) (quoting Cortez, supra, at 418). And like police officers, school officials are “entitled to make an assessment of the situation in light of [this] specialized training and familiarity with the customs of the [school].” See Arvizu, supra, at 276.
Here, petitioners had reasonable grounds to suspect that Redding was in possession of prescription and nonprescription drugs in violation of the school’s prohibition of the “non-medical use, possession, or sale of a drug” on school property or at school events. 531 F. 3d 1071, 1076 (CA9 2008) (en banc); see also id., at 1107 (Hawkins, J., dissenting) (explaining that the school policy defined “drugs” to include “ ‘[a]ny prescription or over-the-counter drug, except those for which permission to use in school has been granted’ ”). As an initial matter, school officials were aware that a few years earlier, a student had become “seriously ill” and “spent several days in intensive care” after ingesting prescription medication obtained from a classmate. App. 10a. Fourth Amendment searches do not occur in a vacuum; rather, context must inform the judicial inquiry. See Cortez, supra, at 417-418. In this instance, the suspicion of drug possession arose at a middle school that had “a history of problems with students using and distributing prohibited and illegal substances on campus.” App. 7a, 10a.
*386 The school’s substance-abuse problems had not abated by the 2003-2004 school year, which is when the challenged search of Redding took place. School officials had found alcohol and cigarettes in the girls’ bathroom during the first school dance of the year and noticed that a group of students including Redding and Marissa Glines smelled of alcohol. Ibid. Several weeks later, another student, Jordan Romero, reported that Redding had hosted a party before the dance where she served whiskey, vodka, and tequila. Id., at 8a, 11a. Romero had provided this report to school officials as a result of a meeting his mother scheduled with the officials after Romero “bec[a]me violent” and “sick to his stomach” one night and admitted that “he had taken some pills that he had got[ten] from a classmate.” Id., at 7a-8a, 10a-lla. At that meeting, Romero admitted that “certain students were bringing drugs and weapons on campus.” Id., at 8a, 11a. One week later, Romero handed the assistant principal a white pill that he said he had received from Glines. Id., at 11a. He reported “that a group of students [were] planning on taking the pills at lunch.” Ibid.
School officials justifiably took quick action in light of the lunchtime deadline. The assistant principal took the pill to the school nurse who identified it as prescription-strength 400-mg ibuprofen. Id., at 12a. A subsequent search of Glines and her belongings produced a razor blade, a naproxen 200-mg pill, and several ibuprofen 400-mg pills. Id., at 13a. When asked, Glines claimed that she had received the pills from Redding. Ibid. A search of Redding’s planner, which Glines had borrowed, then uncovered “several knives, several lighters, a cigarette, and a permanent marker.” Id., at 12a, 14a, 22a. Thus, as the majority acknowledges, ante, at 373-374, the totality of relevant circumstances justified a search of Redding for pills.[1]
*387 B
The remaining question is whether the search was reasonable in scope. Under T L. 0., “a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.” 469 U. S., at 842. The majority concludes that the school officials’ search of Redding’s underwear was not “‘reasonably related in scope to the circumstances which justified the interference in the first place,’” see ante, at 374-377, notwithstanding the officials’ reasonable suspicion that Redding “was involved in pill distribution,” ante, at 373. According to the majority, to be reasonable, this school search required a showing of “danger to the students from the power of the drugs or their quantity” or a “reason to suppose that [Redding] was carrying pills in her underwear.” Ante, at 376-377. Each of these additional requirements is an unjustifiable departure from bedrock Fourth Amendment law in the school setting, where this Court has heretofore read the Fourth Amendment to grant considerable leeway to school officials. Because the school officials searched in a location where the pills could have been hidden, the search was reasonable in scope under T. L. O.
1
The majority finds that “subjective and reasonable societal expectations of personal privacy support... treating]” this type of search, which it labels a “strip search,” as “categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of *388 outer clothing and belongings.” Ante, at 374.[2] Thus, in the majority’s view, although the school officials had reasonable suspicion to believe that Redding had the pills on her person, see ante, at 373-374, they needed some greater level of particularized suspicion to conduct this “strip search.” There is no support for this contortion of the Fourth Amendment.
The Court has generally held that the reasonableness of a search’s scope depends only on whether it is limited to the area that is capable of concealing the object of the search. See, e. g., Wyoming v. Houghton, 526 U. S. 295, 307 (1999) (Police officers “may inspect passengers’ belongings found in the car that aré capable of concealing the object of the search”); Florida v. Jimeno, 500 U. S. 248, 251 (1991) (“The scope of a search is generally defined by its expressed object”); United States v. Johns, 469 U. S. 478, 487 (1985) (search reasonable because “there is no plausible argument that the object of the search could not have been concealed in the packages”); United States v. Ross, 456 U. S. 798, 820 (1982) (“A lawful search . . . generally extends to the entire area in which the object of the search may be found”).[3]
In keeping with this longstanding rule, the “nature of the infraction” referenced in T. L. O. delineates the proper scope of a search of students in a way that is identical to that per *389 mitted for searches outside the school — i. e., the search must be limited to the areas where the object of that infraction could be concealed. See Horton v. California, 496 U. S. 128, 141 (1990) (“Police with a warrant for a rifle may search only places where rifles might be” (internal quotation marks omitted)); Ross, supra, at 824 (“[Pjrobable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase”). A search of a student therefore is permissible in scope under T L. O. so long as it is objectively reasonable to believe that the area searched could conceal the contraband. The dissenting opinion below correctly captured this Fourth Amendment standard, noting that “if a student were rumored to have brought a baseball bat on campus in violation of school policy, a search of that student’s shirt pocket would be patently unjustified.” 531 F. 3d, at 1104 (opinion of Hawkins, J.).
The analysis of whether the scope of the search here was permissible under that standard is straightforward. Indeed, the majority does not dispute that “general background possibilities” establish that students conceal “contraband in their underwear.” Ante, at 376. It acknowledges that school officials had reasonable suspicion to look in Red-ding’s backpack and outer clothing because if “Wilson’s reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making.” Ante, at 374. The majority nevertheless concludes that proceeding any further with the search was unreasonable. See ante, at 374-377; see also ante, at 381 (Ginsburg, J., concurring in part and dissenting in part) (“Any reasonable search for the pills would have ended when inspection of Redding’s backpack and jacket pockets yielded nothing”). But there is no support for this conclusion. The reasonable suspicion that Redding possessed the pills for distribution purposes did not dissipate simply because the search of her backpack turned up nothing. It was eminently reasonable to conclude that the back *390 pack was empty because Redding was secreting the pills in a place she thought no one would look. See Ross, supra, at 820 (“Contraband goods rarely are strewn” about in plain view; “by their very nature such goods must be withheld from public view”).
Redding would not have been the first person to conceal pills in her undergarments. See Hicks, Man Gets 17-Year Drug Sentence, Times-Tribune (Corbin, Ky.), Oct. 7, 2008, pp. 1, 5 (Drug courier “told officials she had the [OxyContin] pills concealed in her crotch”); Conley, Whitehaven: Traffic Stop Yields Hydrocodone Pills, Commercial Appeal (Memphis, Tenn.), Aug. 3, 2007, p. B3 (“An additional 40 hydrocodone pills were found in her pants”); Caywood, Police Vehicle Chase Leads to Drug Arrests, Telegram & Gazette (Worcester, Mass.), June 7, 2008, p. A7 (25-year-old “allegedly had a cigar tube stuffed with pills tucked into the waistband of his pants”); Hubartt, 23-Year-Old Charged With Dealing Ecstasy, Journal Gazette (Fort Wayne, Ind.), Aug. 8,2007, p. 2C (“[W]hile he was being put into a squad car, his pants fell down and a plastic bag containing pink and orange pills fell on the ground”); Sebastian Residents Arrested in Drug Sting, Vero Beach Press Journal, Sept. 16, 2006, p. B2 (Arrestee “told them he had more pills ‘down my pants’ ”). Nor will she be the last after today’s decision, which announces the safest place to secrete contraband in school.
2
The majority compounds its error by reading the “nature of the infraction” aspect of the T. L. O. test as a license to limit searches based on a judge’s assessment of a particular school policy. According to the majority, the scope of the search was impermissible because the school official “must have been aware of the nature and limited threat of the specific drugs he was searching for” and because he “had no reason to suspect that large amounts of the drugs were being passed around, or that individual students were receiving *391 great numbers of pills.” Ante, at 376. Thus, in order to locate a rationale for finding a Fourth Amendment violation in this case, the majority retreats from its observation that the school’s firm no-drug policy “makes sense, and there is no basis to claim that the search was unreasonable owing to some defect or shortcoming of the rule it was aimed at enforcing.” Ante, at 372, n. 1.
Even accepting the majority’s assurances that it is not attacking the rule’s reasonableness, it certainly is attacking the rule’s importance. This approach directly conflicts with T. L. O. in which the Court was “unwilling to adopt a standard under which the legality of a search is dependent upon a judge’s evaluation of the relative importance of various school rules.” 469 U. S., at 342, n. 9. Indeed, the Court in T. L. O. expressly rejected the proposition that the majority seemingly endorses — that “some rules regarding student conduct are by nature too ‘trivial’ to justify a search based upon reasonable suspicion.” Ibid.; see also id., at 343, n. 9 (“The promulgation of a rule forbidding specified conduct presumably reflects a judgment on the part of school officials that such conduct is destructive of school order or of a proper educational environment. Absent any suggestion that the rule violates some substantive constitutional guarantee, the courts should, as a general matter, defer to that judgment”).
The majority’s decision in this regard also departs from another basic principle of the Fourth Amendment: that law enforcement officials can enforce with the same vigor all rules and regulations irrespective of the perceived importance of any of those rules. “In a long line of cases, we have said that when an officer has probable cause to believe a person committed even a. minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable.” Virginia v. Moore, 553 U. S. 164, 171 (2008). The Fourth Amendment rule for searches is the same: Police officers are entitled to search regardless of the perceived triviality of the underlying law. *392 As we have explained, requiring police to make “sensitive, case-by-case determinations of government need,” Atwater v. Lago Vista, 532 U. S. 318, 347 (2001), for a particular prohibition before conducting a search would “place police in an almost impossible spot,” id., at 350.
The majority has placed school officials in this “impossible spot” by questioning whether possession of ibuprofen and naproxen causes a severe enough threat to warrant investigation. Had the suspected infraction involved a street drug, the majority implies that it would have approved the scope of the search. See ante, at 376 (relying on the “limited threat of the specific drugs he was searching for”); ibid, (relying on the limited “power of the drugs” involved). In effect, then, the majority has replaced a school rule that draws no distinction among drugs with a new one that does. As a result, a full search of a student’s person for prohibited drugs will be permitted only if the Court agrees that the drug in question was sufficiently dangerous. Such a test is unworkable and unsound. School officials cannot be expected to halt searches based on the possibility that a court might later find that the particular infraction at issue is not severe enough to warrant an intrusive investigation.[4]
*393 A rule promulgated by a school board represents the judgment of school officials that the rule is needed to maintain “school order” and “a proper educational environment.” T. L. O., 469 U. S., at 343, n. 9. Teachers, administrators, and the local school board are called upon both to “protect the... safety of students and school personnel” and “maintain an environment conducive to learning.” Id., at 353 (Blackmun, J., concurring in judgment). They are tasked with “watch[ing] over a large number of students” who “are inclined to test the outer boundaries of acceptable conduct and to imitate the misbehavior of a peer if that misbehavior is not dealt with quickly.” Id., at 352. In such an environment, something as simple as a “water pistol or peashooter can wreak [havoc] until it is taken away.” Ibid. The danger posed by unchecked distribution and consumption of prescription pills by students certainly needs no elaboration.
Judges are not qualified to second-guess the best manner for maintaining quiet and order in the school environment. Such institutional judgments, like those concerning the selection of the best methods for “restraining students] from assaulting one another, abusing drugs and alcohol, and committing other crimes,” id., at 342, n. 9, “involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country,” Collins v. Harker Heights, 503 U. S. 115, 129 (1992); cf. Regents of Univ. of Mich. v. Ewing, 474 U. S. 214, 226 (1985) (observing that federal courts are not “suited to evaluating] the substance of the multitude of academic decisions” or disciplinary decisions “that are made daily by faculty members of public educa *394 tional institutions”). It is a mistake for judges to assume the responsibility for deciding which school rules are important enough to allow for invasive searches and which rules are not.
3
Even if this Court were authorized to second-guess the importance of school rules, the Court’s assessment of the importance of this district’s policy is flawed. It is a crime to possess or use prescription-strength ibuprofen without a prescription. See Ariz. Rev. Stat. Ann. § 13-3406(A)(1) (West Supp. 2008) ("A person shall not knowingly . . . [possess or use a prescription-only drug unless the person obtains the prescription-only drug pursuant to a valid prescription of a prescriber who is licensed pursuant to [state law]”).[5] By prohibiting unauthorized prescription drugs on school grounds — and conducting a search to ensure students abide by that prohibition — the school rule here was consistent with a routine provision of the state criminal code. It hardly seems unreasonable for school officials to enforce a rule that, in effect, proscribes conduct that amounts to a crime.
Moreover, school districts have valid reasons for punishing the unauthorized possession of prescription drugs on school *395 property as severely as the possession of street drugs; “[tjeenage abuse of over-the-counter and prescription drugs poses an increasingly alarming national crisis.” Get Teens Off Drugs, 72 The Education Digest, No. 4, p. 75 (Dec. 2006). As one study noted, “more young people ages 12-17 abuse prescription drugs than any illicit drug except marijuana— more than cocaine, heroin, and methamphetamine combined.” Executive Office of the President, Office of National Drug Control Policy (ONDCP), Prescription for Danger 1 (Jan. 2008) (hereinafter Prescription for Danger). And according to a 2005 survey of teens, “nearly one in five (19 percent or 4.5 million) admit abusing prescription drugs in their lifetime.” Columbia University, The National Center on Addiction and Substance Abuse (CASA), “You’ve Got Drugs!” V: Prescription Drug Pushers on the Internet 2 (July 2008); see also Dept, of Health and Human Services, National Institute on Drug Abuse, High School and Youth Trends 2 (Dec. 2008) (“In 2008, 15.4 percent of 12th-graders reported using a prescription drug nonmedically within the past year”).
School administrators can reasonably conclude that this high rate of drug abuse is being fueled, at least in part, by the increasing presence of prescription drugs on school campuses. See, e. g., Gibson, Grand Forks Schools See Rise in Prescription Drug Abuse, Grand Forks Herald, Nov. 16, 2008, pp. Al, A6 (explaining that “prescription drug abuse is growing into a larger problem” as students “ ‘bring them to school and sell them or just give them to their friends’ ”). In a 2008 survey, “44 percent of teens sa[id] drugs are used, kept or sold on the grounds of their schools.” CASA, National Survey of American Attitudes on Substance Abuse XIII: Teens and Parents 19 (Aug. 2008) (hereinafter National Survey). The risks posed by the abuse of these drugs are every bit as serious as the dangers of using a typical street drug.
Teenagers are nevertheless apt to “believe the myth that these drugs provide a medically safe high.” ONDCP, Teens *396 and Prescription Drugs: An Analysis of Recent Trends on the Emerging Drug Threat 3 (Feb. 2007) (hereinafter Teens and Prescription Drugs). But since 1999, there has “been a dramatic increase in the number of poisonings and even deaths associated with the abuse of prescription drugs.” Prescription for Danger 4; see also Dept. of Health and Human Services, The NSDUH Report: Trends in Nonmedical Use of Prescription Pain Relievers: 2002 to 2007, p. 1 (Feb. 5, 2009) (“[Approximately 324,000 emergency department visits in 2006 involved the nonmedical use of pain relievers”); CASA, Under the Counter: The Diversion and Abuse of Controlled Prescription Drugs in the U. S., p. 25 (July 2005) (“In 2002, abuse of controlled prescription drugs was implicated in at least 23 percent of drug-related emergency department admissions and 20.4 percent of all single drug-related emergency department deaths”). At least some of these injuries and deaths are likely due to the fact that “[m]ost controlled prescription drug abusers are poly-substance abusers,” id., at 3, a habit that is especially likely to result in deadly drug combinations. Furthermore, even if a child is not immediately harmed by the abuse of prescription drugs, research suggests that prescription drugs have become “gateway drugs to other substances of abuse.” Id., at 4; Healy, Skipping the Street, Los Angeles Times, Sept. 15,2008, p. FI (“Boomers made marijuana their ‘gateway’... but a younger generation finds prescription drugs are an easier score”); see also National Survey 17 (noting that teens report “that prescription drugs are easier to buy than beer”).
Admittedly, the ibuprofen and naproxen at issue in this case are not the prescription painkillers at the forefront of the prescription-drug-abuse problem. See Prescription for Danger 3 (“Pain relievers like Vicodin and OxyContin are the prescription drugs most commonly abused by teens”). But they are not without their own dangers. As nonsteroidal antiinflammatory drugs (NSAIDs), they pose a risk of death from overdose. The Pill Book 821, 827 (H. Silverman *397 ed., 13th ed. 2008) (observing that ibuprofen and naproxen are NSAIDs and “[p]eople have died from NSAID overdoses”). Moreover, the side effects caused by the use of NSAIDs can be magnified if they are taken in combination with other drugs. See, e.g., Reactions Weekly, No. 1235, p. 18 (Jan. 17, 2009) (“A 17-year-old girl developed allergic interstitial nephritis and renal failure while receiving escitalopram and ibuprofen”); id., No. 1232, at 26 (Dec. 13, 2008) (“A 16-month-old boy developed iron deficiency anaemia and hypoalbuminaemia during treatment with naproxen”); id., No. 1220, at 15 (Sept. 20, 2008) (18-year-old “was diagnosed with pill-induced oesophageal perforation” after taking ibuprofen “and was admitted to the [intensive care unit]”); id., No. 1170, at 20 (Sept. 22, 2007) (“A 12-year-old boy developed anaphylaxis following ingestion of ibuprofen”).
If a student with a previously unknown intolerance to ibuprofen or naproxen were to take either drug and become ill, the public outrage would likely be directed toward the school for failing to take steps to prevent the unmonitored use of the drug. In light of the risks involved, a school’s decision to establish and enforce a school prohibition on the possession of any unauthorized drug is thus a reasonable judgment.[6]
* *
In determining whether the search’s scope was reasonable under the Fourth Amendment, it is therefore irrelevant whether officials suspected Redding of possessing *398 prescription-strength ibuprofen, nonprescription-strength naproxen, or some harder street drug. Safford prohibited its possession on school property. Reasonable suspicion that Redding was in possession of drugs in violation of these policies, therefore, justified a search extending to any area where small pills could be concealed. The search did not violate the Fourth Amendment.
II
By declaring the search unreasonable in this case, the majority has “ ‘surrender[ed] control of the American public school system to public school students’” by invalidating school policies that treat all drugs equally and by second-guessing swift disciplinary decisions made by school officials. See Morse, 551 U. S., at 421 (Thomas, J., concurring) (quoting Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503, 526 (1969) (Black, J., dissenting)). The Court’s interference in these matters of great concern to teachers, parents, and students illustrates why the most constitutionally sound approach to the question of applying the Fourth Amendment in local public schools would in fact be the complete restoration of the common-law doctrine of in loco parentis.
“[I]n the early years of public schooling,” courts applied the doctrine of in loco parentis to transfer to teachers the authority of a parent to “'command obedience, to control stubbornness, to quicken diligence, and to reform bad habits.’” Morse, supra, at 413-414 (Thomas, J., concurring) (quoting State v. Pendergrass, 19 N. C. 365, 365-366 (1837)). So empowered, schoolteachers and administrators had almost complete discretion to establish and enforce the rules they believed were necessary to maintain control over their classrooms. See 2 J. Kent, Commentaries on American Law *205 (“So the power allowed by law to the parent over the person of the child may be delegated to a tutor or instructor, the better to accomplish the purpose of education”); 1 W. *399 Blackstone, Commentaries on the Laws of England 441 (1765) (“He may also delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then in loco parentis, and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed”).[7] The perils of judicial policy-making inherent in applying Fourth Amendment protections to public schools counsel in favor of a return to the understanding that existed in this Nation’s first public schools, which gave teachers discretion to craft the rules needed to carry out the disciplinary responsibilities delegated to them by parents.
If the common-law view that parents delegate to teachers their authority to discipline and maintain order were to be applied in this case, the search of Redding would stand. There can be no doubt that a parent would have had the authority to conduct the search at issue in this ease. Parents have “immunity from the strictures of the Fourth Amendment” when it comes to searches of a child or that child’s belongings. T. L. O., 469 U. S., at 337; see also id., at 336 (A parent’s authority is “not subject to the limits of the Fourth Amendment”); Griffin v. Wisconsin, 483 U. S. 868, 876 (1987) (“[P]arental custodial authority” does not require “judicial approval for [a] search of a minor child’s room”).
As acknowledged by this Court, this principle is based on the “societal understanding of superior and inferior” with respect to the “parent and child” relationship. Georgia v. Randolph, 547 U. S. 103, 114 (2006). In light of this relation *400 ship, the Court has indicated that a parent can authorize a third-party search of a child by consenting to such a search, even if the child denies his consent. See ibid.; see also 4 W. LaFave, Search and Seizure § 8.3(d), p. 160 (4th ed. 2004) (“[A] father, as the head of the household with the responsibility and the authority for the discipline, training and control of his children, has a superior interest in the family residence to that of his minor son, so that the father’s consent to search would be effective notwithstanding the son’s contemporaneous on-the-scene objection” (internal quotation marks omitted)). Certainly, a search by the parent himself is no different, regardless of whether or not a child would prefer to be left alone. See id., § 8.4(b), at 202 (“[E]ven [if] a minor child . . . may think of a room as ‘his,’ the overall dominance will be in his parents” (some internal quotation marks omitted)).
Restoring the common-law doctrine of in loco parentis would not, however, leave public schools entirely free to impose any rule they choose. “If parents do not like the rules imposed by those schools, they can seek redress in school boards or legislatures; they can send their children to private schools or homeschool them; or they can simply move.” See Morse, supra, at 420 (Thomas, J., concurring). Indeed, parents and local government officials have proved themselves quite capable of challenging overly harsh school rules or the enforcement of sensible rules in insensible ways.
For example, one community questioned a school policy that resulted in “an 11-year-old [being] arrested, handcuffed and taken to jail for bringing a plastic butter knife to school.” Downey, Zero Tolerance Doesn’t Always Add Up, Atlanta Journal-Constitution, Apr. 6, 2009, p. All. In another, “[a]t least one school board member was outraged” when 14 elementary-school students were suspended for “imitating drug activity” after they combined Kool-Aid and sugar in plastic bags. Grant, Pupils Trading Sweet Mix Get Sour *401 Shot of Discipline, Pittsburgh Post-Gazette, May 18, 2006, pp. Bl, B2. Individuals within yet another school district protested a “‘zero-tolerance’ policy toward weapons” that had become “ ‘so rigid that it force[d] schools to expel any student who belongs to a military organization, a drum-and-bugle corps or any other legitimate extracurricular group and is simply transporting what amounts to harmless props.’” Richardson, School Gun Case Sparks Cries For “Common Sense,” Washington Times, Feb. 13-14, 2009, pp. Al, A9.[8]
These local efforts to change controversial school policies through democratic processes have proved successful in many cases. See, e. g., Postal, Schools’ Zero Tolerance Could Lose Some Punch, Orlando Sentinel, Apr. 24, 2009, p. B3 (“State lawmakers want schools to dial back strict zero-tolerance policies so students do not end up in juvenile detention for some ‘goofy thing’”); Richardson, Tolerance Waning for Zero-tolerance Rules, Washington Times, Apr. 21, 2009, p. A3 (“[A] few states have moved to relax their laws. Utah now allows students to bring asthma inhalers to school without violating the zero-tolerance policy on *402 drugs”); see also Nussbaum, Becoming Fed Up With Zero Tolerance, N. Y. Times, Sept. 3, 2000, section 14, pp. 1, 8 (discussing a report that found that “widespread use of zero-tolerance discipline policies was creating as many problems as it was solving and that there were many cases around the country in which students were harshly disciplined for infractions where there was no harm intended or done”).
In the end, the task of implementing and amending public school policies is beyond this Court’s function. Parents, teachers, school administrators, local politicians, and state officials are all better suited than judges to determine the appropriate limits on searches conducted by school officials. Preservation of order, discipline, and safety in public schools is simply not the domain of the Constitution. And, common sense is not a judicial monopoly or a constitutional imperative.
Ill
“[T]he nationwide drug epidemic makes the war against drugs a pressing concern in every school.” Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U. S. 822, 834 (2002). And yet the Court has limited the authority of school officials to conduct searches for the drugs that the officials believe pose a serious safety risk to their students. By doing so, the majority has confirmed that a return to the doctrine of in loco parentis is required to keep the judiciary from essentially seizing control of public schools. Only then will teachers again be able to “ 'govern the[ir] pupils, quicken the slothful, spur the indolent, restrain the impetuous, and control the stubborn’ ” by making “ 'rules, giv[ing] commands, and punish[ing] disobedience’” without interference from judges. Morse, 551 U. S., at 414 (Thomas, J., concurring). By deciding that it is better equipped to decide what behavior should be permitted in schools, the Court has undercut student safety and undermined the authority of school administrators and local officials. Even more trou *403 bling, it has done so in a case in which the underlying response by school administrators was reasonable and justified. I cannot join this regrettable decision. I, therefore, respectfully dissent from the Court’s determination that this search violated the Fourth Amendment.

 To be sure, Redding denied knowledge of the pills and the materials in her planner. App. 14a. But her denial alone does not negate the reason *387 able suspicion held by school officials. See New Jersey v. T. L. O., 469 U. S. 325, 345 (1985) (finding search reasonable even though “T. L. O. had been accused of smoking, and had denied the accusation in the strongest possible terms when she stated that she did not smoke at all”).

 Like the dissent below, “I would reserve the term ‘strip search’ for a search that required its subject to fully disrobe in view of officials.” 531 F. 3d 1071,1091, n. 1 (CA9 2008) (opinion of Hawkins, J.). The distinction between a strip search and the search at issue in this ease may be slight, but it is a distinction that the law has drawn. See, e. g., Sandin v. Conner, 515 U. S. 472, 475 (1995) (“The officer subjected Conner to a strip search, complete with an inspection of the rectal area”); Bell v. Wolfish, 441 U. S. 520, 558, and n. 39 (1979) (describing visual inspection of body cavities as “part of a strip search”).

 The Court has adopted a different standard for searches involving an “intrusiofn] into the human body.” Schmerber v. California, 384 U. S. 757, 770 (1966). The search here does not implicate the Court’s cases governing bodily intrusions, however, because it did not involve a “physical intrusion, penetrating beneath the skin,” Skinner v. Railway Labor Executives’ Assn., 489 U. S. 602, 616 (1989).

 Justice Ginsburg suggests that requiring Redding to “sit on a chair outside [the assistant principal’s] office for over two hours” and failing to call her parents before conducting the search constitutes an “[a]buse of authority” that “should not be shielded by official immunity.” See ante, at 382. But the school was under no constitutional obligation to call Redding’s parents before conducting the search: “[Reasonableness under the Fourth Amendment does not require employing the least intrusive means, because the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.” Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U. S. 822, 837 (2002) (internal quotation marks and brackets omitted). For the same reason, the Constitution did not require sehool officials to ask “followup questions” after they had already developed reasonable suspicion that Redding possessed drugs. See ante, at 372,376 (majority opinion); ante, at 381 (opinion of Ginsburg, J.). In any event, the suggestion that requiring Redding to sit in a chair *393 for two hours amounted to a deprivation of her constitutional rights, or that school officials are required to engage in detailed interrogations before conducting searches for drugs, only reinforces the conclusion that the Judiciary is ill equipped to second-guess the daily decisions made by public administrators. Cf. Beard v. Banks, 548 U. S. 521, 536-537 (2006) (Thomas, J., concurring in judgment).

 Arizona’s law is not idiosyncratic; many States have separately criminalized the unauthorized possession of prescription drugs. See, e. g., Mo. Rev. Stat. § 577.628(1) (2008 Cum. Supp.) (“No person less than twenty-one years of age shall possess upon the real property comprising a public or private elementary or secondary school or school bus prescription medication without a valid prescription for such medication”); Okla. Stat., Tit. 59, § 353.24(2) (West 2008 Supp.) (“It shall be unlawful for any person, firm or corporation to . . . [sjell, offer for sale, barter or give away any unused quantity of drugs obtained by prescription, except... as otherwise provided by the [State] Board of Pharmacy”); Utah Code Ann. §58-17b-501(12) (Lexis 2007) (“ ‘Unlawful conduct’ includes:... using a prescription drug ... for himself that was not lawfully prescribed for him by a practitioner”); see also Ala. Code §34-23-7 (2002); Del. Code Ann., Tit. 16, §4754A(a)(4) (2003); Fla. Stat. §499.005(14) (2007); N. H. Rev. Stat. Ann. §318:42(1) (West Supp. 2008).

 Schools have a significant interest in protecting all students from prescription drug abuse; young female students are no exception. See Teens and Prescription Drugs 2 (“Prescription drugs are the most commonly abused drug among 12-13-year-olds”). In fact, among 12- to 17-year-olds, females are “more likely than boys to have abused prescription drugs” and have “higher rates of dependence or abuse involving prescription drugs.” Id., at 5. Thus, rather than undermining the relevant governmental interest here, Redding’s age and sex, if anything, increased the need for a search to prevent the reasonably suspected use of prescription drugs.

 The one aspect of school discipline with respect to which the judiciary at times became involved was the “imposition of excessive physical punishment.” Morse, 551 U. S., at 416 (Thomas, J., concurring). Some early courts found corporal punishment proper “as long as the teacher did not act with legal malice or cause permanent injury”; while other courts intervened only if the punishment was “clearly excessive.” Ibid, (emphasis deleted; internal quotation marks omitted) (collecting decisions).

 See also, e.g., Smydo, Allderdice Parents Decry Suspensions, Pittsburgh Post-Gazette, Apr. 16, 2009, p. Bl (Parents “believe a one-day suspension for a first-time hallway infraction is an overreaction”); O’Brien & Buekham, Girl’s Smooch on School Bus Leads to Suspension, Buffalo News, Jan. 6, 2008, p. Bl (Parents of 6-year-old say the “school officials overreacted” when they punished their daughter for “kissing a seeondgrade boy”); Stewart, Dad Says School Overreacted, Houston Chronicle, Dec. 12,2007, p. B5 (“The father of a 13-year-old... said the school district overstepped its bounds when it suspended his daughter for taking a cell phone photo of another cheerleader getting out of the shower during a sleepover in his home”); Dumenigo & Mueller, “Cops and Robbers” Suspension Criticized at Sayreville School, Star-Ledger (New Jersey), Apr. 6, 2000, p. 15 (“ T think it’s ridiculous,’ said the mother of one of the [kindergarten] boys. ‘They’re little boys playing with each other.... [W]hen did a finger become a weapon?’ ”).